WORLDWIDE CHURCH OF GOD, a
California Corporation, Plaintiff–
Counter–Defendant–Appellant,

v.

PHILADELPHIA CHURCH OF GOD,
INC., an Oklahoma Corporation, De-
fendant–Counter–Claimant–Appellee.

Nos. 99–55850, 99–56489,
99–55934, 99–56005.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 1999

Filed Sept. 18, 2000

Allan Browne, Benjamin D. Scheibe, Sylvia P. Lardiere, Browne & Woods, LLP, Beverly Hills, California; Ralph K. Helge, Pasadena, CA, for the plaintiff/counter-defendant/appellant.

Mark B. Helm, Munger, Tolles & Olson, LLP, Los Angeles, California, and Kelly M. Klaus, Munger, Tolles & Olson, LLP, San Francisco, California, for the defendant/counter-claimant-appellee.

Before: BRUNETTI and TASHIMA, Circuit Judges, SCHWARZER,* Senior District Judge.

SCHWARZER, Senior District Judge:

Appellant Worldwide Church of God ("WCG") is a nonprofit religious organization whose late Pastor General, Herbert W. Armstrong, wrote a 380–page book entitled *Mystery of the Ages* ("*MOA*"), the copyright to which is held by WCG. After Armstrong's death, WCG retired *MOA* from distribution and use. Appellee Philadelphia Church of God ("PCG"), also a nonprofit religious organization, then appropriated *MOA* for use in its religious observance, copying it in its entirety and distributing large numbers of copies to its members and the public. We must decide whether PCG's copying and dissemination of *MOA* constitutes fair use under the Copyright Statute. 17 U.S.C. § 107.

* The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

## FACTUAL BACKGROUND

Herbert Armstrong founded the Radio Church of God, later renamed Worldwide Church of God, in 1934. He held the title of "Pastor General with the spiritual rank of Apostle" and was its undisputed spiritual and temporal leader until his death in 1986. Armstrong was a prolific writer, producing over three thousand articles for the church's magazine *The Plain Truth,* all of which were copyrighted in the name of WCG, or its affiliate teaching arm, Ambassador College.

Armstrong wrote *MOA,* his final work, between 1984 and 1985. He completed it when he was ninety-two years old, shortly before his death. He copyrighted it in the name of WCG and published it in serial form in *The Plain Truth* magazine, distributed free of charge to approximately eight million people. In addition, WCG distributed over 1.24 million copies free of charge to employees and to viewers of WCG telecasts. In all, WCG put over nine million free copies of *MOA* into circulation.

Two years after Armstrong's death, WCG decided to discontinue distribution of *MOA* for several reasons, including the fact that the Church's positions on various doctrines such as divorce, remarriage, and divine healing had changed. The Church hoped to "prevent a transgression of conscience by proclaiming what the Church considered to be ecclesiastical error" espoused in *MOA* and it considered that Armstrong, who was ninety-two when he wrote *MOA,* conveyed outdated views that were racist in nature. Its Advisory Council of Elders indicated that the Church stopped distributing *MOA* because of "cultural standards of social sensitivity" and to avoid racial conflict. The Council noted, "Insensitivity in this area is contrary to the doctrinal program of WCG to promote racial healing and reconciliation among the races." WCG disposed of excess inventory copies of *MOA* and stopped distribution, but retained archival and research copies. WCG never sought to withdraw or destroy personal copies or copies held by public institutions or any public library, nor did it request that its members destroy their copies. WCG has indicated an interest in publishing an annotated *MOA* sometime in the future but has not yet begun work on it.

In 1989, two former WCG ministers, Gerald Flurry and John Amos, founded a new religious organization, PCG. The new church grew to over six thousand members by 1996 and claims strictly to follow the teachings of Herbert Armstrong. PCG asserts that *MOA* is central to its religious practice and required reading for all members hoping to be baptized into PCG. Until January 1997, PCG relied on existing copies of *MOA* but it then began copying *MOA* for its own use. It is undisputed that PCG never requested permission from WCG to print *MOA.* It is also undisputed that PCG copied *MOA* verbatim, deleting only WCG from the copyright page and substituting Herbert Armstrong in its place, and deleting a "Suggested Reading" page and a warning against reproduction without permission. PCG has distributed approximately thirty thousand copies of its *MOA* in English text, in addition to foreign-language versions. It has advertised its version in newspapers and periodicals and has received substantial contributions from persons who have received its *MOA.*

When PCG ignored WCG's demand that it cease infringing its copyright and continued distribution of its *MOA,* this action followed.

## PROCEDURAL BACKGROUND

In its complaint, WCG alleged that PCG, by reproducing, distributing, promoting, advertising and offering unlawful and unauthorized copies of *MOA,* has been infringing WCG's copyright. PCG answered, denying WCG's ownership of the copyright and asserting that WCG's claim was barred by the Free Exercise Clause of the First Amendment, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4, and the fair use doctrine, 17 U.S.C. § 107, and counterclaimed

seeking a declaration of its right to reproduce and distribute *MOA*.[1]

WCG moved for partial summary judgment and for a preliminary injunction to restrain PCG from printing or distributing any materials copyrighted by WCG, including *MOA*. PCG filed a cross-motion for summary adjudication. The district court denied WCG's motions and granted PCG's motion for summary adjudication. It concluded that Armstrong was the author of *MOA* and that it was not a work for hire, implying that WCG did not own the copyright, and that PCG's use of *MOA* is statutorily protected "fair use" of the work under 17 U.S.C. § 107.

WCG appeals the order granting summary judgment to PCG (No. 99–55934), the denial of its motion for a preliminary injunction (No. 99–55850), and the denial of its motion to amend the judgment (No. 99–56005). On June 30, 1999, this court granted the motions to consolidate these three appeals. On July 23, 1999, the district court entered judgment for PCG on WCG's complaint pursuant to Federal Rule of Civil Procedure 54(b). WCG filed a notice of appeal with respect to that judgment (No. 99–56489), and this court granted appellee's motion to consolidate that appeal as well. Because all of the district court's orders are merged into the final judgment, we have jurisdiction pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment *de novo*. *See Balint v. Carson City, Nevada*, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc).

## DISCUSSION

### I. OWNERSHIP OF THE COPYRIGHT

■ PCG disputes WCG's ownership of the *MOA* copyright, contending that Armstrong, not WCG, had the right to control *MOA*'s creation and that therefore WCG cannot claim either authorship or ownership of *MOA* through the "work-for-hire" doctrine under 17 U.S.C. § 201(b), and the

district court so found. We need not address this hotly disputed issue, however, for it is undisputed that Armstrong, who owned the copyright, bequeathed his entire estate to WCG. His Will left all of his real and personal property to WCG. The Will was admitted to probate and was not challenged. The Superior Court entered an order of final distribution providing that "preliminary distribution having . . . been made, . . . all other property belonging to said estate . . . be and is hereby distributed to Worldwide Church of God." Because the ownership of a copyright may, under 17 U.S.C. § 201(d), "be bequeathed by will," WCG is now the owner.

■ PCG responds that "Armstrong granted a nonexclusive, implied license for *MOA* to be disseminated by those who value its religious message." As a result, it argues, WCG took any copyright subject to this preexisting license. The existence of a license creates an affirmative defense to a claim of copyright infringement. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir.1996), citing *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 559 (9th Cir.1990). PCG did not plead this defense in its answer (or otherwise raise it in the district court) as required by Federal Rule of Civil Procedure 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively [the affirmative defense of] . . . license."). Accordingly, the issue is not properly before us. *See Magana v. Commonwealth of the Northern Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir.1997). In any event, the argument is without merit. An implied license may be granted orally or be implied from conduct. *See Effects*, 908 F.2d at 558. PCG does not contend that Armstrong granted it a license, but only that he wished *MOA* to have the largest audience possible. It has offered no evidence that Armstrong created *MOA* for dissemination by third parties, much less that he intended to license

---

1. The district court granted WCG's motion to strike the RFRA defense and counterclaim before reaching PCG's summary judgment motion. The RFRA issue is before us, therefore, only by way of the appeal from the final judgment.

PCG to reprint the entire book and use it for its own church. We conclude that Armstrong's copyright passed to WCG through his Will and that WCG is the owner of the copyright in *MOA.*

## II. THE "FAIR USE" DEFENSE

### A.

The district court concluded that the facts "support a finding that PCG's use of *MOA* is a statutorily protected 'fair use' of the work." In reaching this conclusion, it found that PCG uses *MOA* "for non-profit religious and educational purposes," that copying a complete religious text "is reasonable in relation to that use," that WCG presented no evidence that it lost members due to PCG's distribution, that a potential annotated *MOA* produced by WCG would not compete against PCG's copies of *MOA,* and that *MOA*'s being out of print provided additional justification for PCG's production of *MOA.* WCG contends that the district court's determination of "fair use" is factually and legally erroneous.

Fair use is a mixed question of law and fact. If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work. *See Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1150–51 (9th Cir.1986). Where the record is sufficient to evaluate each of the statutory factors, "an appellate court 'need not remand for further fact-finding ... [but] may conclude as a matter of law that the ... use do[es] not qualify as a fair use of the copyrighted work.'" *Harper & Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting *Pacific & Southern Co. v. Duncan,* 744 F.2d 1490, 1495 (11th Cir. 1984)).

Under § 106 of the Copyright Act, WCG as the owner of the copyright has the exclusive right to reproduce and distribute copies of *MOA.* 17 U.S.C. § 106(1), (3). That right is not diminished or qualified by the fact that WCG is a not-for-profit organization and does not realize monetary benefit from the use of the copyrighted work. Nor is that right affected by the religious nature of its activity; Congress narrowly limited the privilege accorded religious uses to "performance of a ... literary or musical work ... or display of a work, in the course of services at a place of worship or other religious assembly." 17 U.S.C. § 110(3). PCG's unauthorized copying and distribution of *MOA* falls outside of that narrow exception to copyright protection. *See F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 214 U.S.P.Q. 409, 411, 1982 WL 19198 (7th Cir.) ("F.E.L can prevent churches from copying or publishing its copyrighted works, even if the churches only intend to use the copies or publications at not-for-profit religious services.... Neither the religious element nor the non-profit element of a performance will protect illegal copying or publishing."). We have held that

> we must be careful not to deprive religious organizations of all recourse to the protections of civil law that are available to all others. Such a deprivation would raise its own serious problems under the Free Exercise Clause [citation omitted]. It would also leave religious organizations at the mercy of anyone who appropriated their property with an assertion of religious right to it.

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar,* 179 F.3d 1244, 1248 (9th Cir.1999).

Nor do First Amendment free speech considerations support PCG's claim of fair use based on WCG's withdrawal of *MOA* from distribution.

> The public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts. The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work con-

tains material of possible public importance.

*Harper & Row,* 471 U.S. at 558, 105 S.Ct. 2218 (quoting *Iowa State Univ. Research Found., Inc. v. American Broad. Cos., Inc.,* 621 F.2d 57, 61 (2d Cir.1980)). "Moreover, freedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all.' " *Id.* at 559, 105 S.Ct. 2218 (quoting *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977)); *see also Salinger v. Random House, Inc.,* 811 F.2d 90, 100 (2d Cir.1987) (holding that copyright owner has right to protect "the expressive content of his unpublished writings for the term of his copyright"). This is not a case of "abuse of the copyright owner's monopoly as an instrument to suppress facts." *Harper & Row,* 471 U.S. at 559, 105 S.Ct. 2218. *Cf. Rosemont Enter., Inc. v. Random House, Inc.,* 366 F.2d 303, 311 (2d Cir.1966) (concurring opinion) (purchase by Howard Hughes of copyright on magazine articles to block publication of his biography). As the Supreme Court has explained:

> [A]lthough dissemination of creative works is a goal of the Copyright Act, the Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works. The copyright term is limited so that the public will not be permanently deprived of the fruits of an artist's labors. [Citation omitted]. But nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright.

*Stewart v. Abend,* 495 U.S. 207, 228–29, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990).

### B.

PCG seeks to defend its infringing activity as fair use under § 107 of the Copyright Act. That section provides in relevant part that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship or research, is not an infringement of copyright." 17 U.S.C. § 107. In determining whether the use made of a work in any particular case is a fair use, § 107 provides that the factors to be considered shall include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The common-law background of the fair use doctrine illuminates the consideration of the factors Congress incorporated into § 107. As the Supreme Court has explained:

> The statutory formulation of the defense of fair use in the Copyright Act reflects the intent of Congress to codify the common-law doctrine.... "[T]he author's consent to a reasonable use of his copyrighted works ha[d] always been implied by the courts as a necessary incident of the constitutional policy of promoting the progress of science and the useful arts, since a prohibition of such use would inhibit subsequent writers from attempting to improve upon prior works and thus ... frustrate the very ends sought to be attained." [Ball, Law of Copyright and Literary Property 260 (1944) ]. Professor Latman, in a study of the doctrine of fair use commissioned by Congress for the revision effort, see [*Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 462–463 n. 9, 104 S.Ct. 774, 78 L.Ed.2d 574 (dissenting opinion) ], summarized prior law as turning on the "importance of the material copied or performed from the point of view of the reasonable copyright owner. In other words, would the reasonable copyright owner have consented to the use?"

*Harper & Row,* 471 U.S. at 549–50, 105 S.Ct. 2218.

The Court went on to observe that Justice Story gave early judicial recognition to the doctrine, quoting the following statement:

> [A] reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if he thus cites the most important parts of the work, with a view, not to criticise, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy.

*Id.* at 550, 105 S.Ct. 2218 (quoting *Folsom v. Marsh,* 9 F.Cas. 342, 344–45 (C.C.D.Mass.1841)).

### C.

■ With this background in mind, we turn to consideration of the four statutory factors.

1. The first factor calls for consideration of "the purposes and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation [citations omitted] or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). As Justice Story put it: "There must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work." *Folsom,* 9 F.Cas. at 345.

■ PCG's copying of WCG's *MOA* in its entirety bespeaks no "intellectual labor and judgment." It merely "super-sedes the object" of the original *MOA,* to serve religious practice and education. Although "transformative use is not absolutely necessary for a finding of fair use," *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164, where the "use is for the same intrinsic purpose as [the copyright holder's] ... such use seriously weakens a claimed fair use." *Weissmann v. Freeman,* 868 F.2d 1313, 1324 (2d Cir.1989). Nevertheless, PCG argues that this factor favors fair use because its use is not commercial or for profit. The Supreme Court has cautioned that "the commercial or nonprofit educational purpose of a work is only one element of the first factor inquiry into its purpose and character." *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164. While the fact that a publication is commercial tends to weigh against fair use, the absence of a commercial use merely eliminates the presumption of unfairness. "[T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement...." *Id.; see also Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 450, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) ("Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have."); *Marcus v. Rowley,* 695 F.2d 1171, 1175 (9th Cir.1983). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218. We agree with the Second Circuit that in weighing whether the purpose was for "profit," "[m]onetary gain is not the sole criterion ... [p]articularly in [a] ... setting [where] profit is ill-measured in dollars." *Weissmann,* 868 F.2d at 1324 (holding that a professor's verbatim copying of an academic work was not fair use, in part because "the profit/nonprofit distinction is context specific, not dollar dominated" and a professor can "profit" by gaining recognition among his peers and authorship

credit). *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1971) 1811 (defining "profit" as "an advantage, [a] benefit").

Putting aside the disputed question whether PCG uses *MOA* to generate income, and having in mind that like academia, religion is generally regarded as "not dollar dominated," *MOA*'s use unquestionably profits PCG by providing it at no cost with the core text essential to its members' religious observance, by attracting through distribution of *MOA* new members who tithe ten percent of their income to PCG, and by enabling the ministry's growth. During the time of PCG's production and distribution of copies of *MOA* its membership grew to some seven thousand members. It is beyond dispute that PCG "profited" from copying *MOA*—it gained an "advantage" or "benefit" from its distribution and use of *MOA* without having to account to the copyright holder. The first factor weighs against fair use.

■ 2. The second statutory factor, "the nature of the copyrighted work," turns on whether the work is informational or creative. *See Harper & Row,* 471 U.S. at 563, 105 S.Ct. 2218 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *see also Sony,* 464 U.S. at 455 n. 40, 104 S.Ct. 774 ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture."); *Hustler,* 796 F.2d at 1153–54 ("The scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved."). PCG's brief describes *MOA* as "primarily a textual, historical account of [Armstrong's] views of the 'the truth' of the Bible." While it may be viewed as "factual" by readers who share Armstrong's religious beliefs, the creativity, imagination and originality embodied in *MOA* tilt the scale against fair use. *See Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1402 (9th Cir.1997).

■ 3. The third factor directs us to consider "the amount and substantiality of the portion used in relation to the copy-righted work as a whole." 17 U.S.C. § 107(3). PCG copied the entire *MOA* verbatim, deleting only the "Suggested Readings" and the reference to "Worldwide Church of God" from the copyright page. While "wholesale copying does not preclude fair use per se," copying an entire work "militates against a finding of fair use." *Hustler,* 796 F.2d at 1155. Moreover, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper & Row,* 471 U.S. at 565, 105 S.Ct. 2218.

■ PCG argues its verbatim copying of the whole work is reasonable because its use of *MOA* is religious in nature. "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell,* 510 U.S. at 586–87, 114 S.Ct. 1164. In *Campbell,* the Court held that "[c]opying does not become excessive in relation to parodic purpose merely because the portion taken was the original's heart." *Id.* at 588, 114 S.Ct. 1164. PCG's copying stands on a different footing for the purpose for which it uses the *MOA* is the same as WCG's. This court has held "that a finding that the alleged infringers copied the material to use it for the same intrinsic purpose for which the copyright owner intended it to be used is strong indicia of no fair use." *Marcus,* 695 F.2d at 1175. Reliance on *Sony* would be misplaced. There, the Supreme Court held that reproduction of the entire work "[did] not have its ordinary effect of militating against a finding of fair use" under the unique circumstances of that case, to wit: copying of videotapes for time-shifting for personal use to "enable[ ] a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Sony,* 464 U.S. at 449–50, 104 S.Ct. 774. No such circumstances exist here to justify PCG's reproduction of the entire work. PCG uses the *MOA* as a central element of its members' religious observance; a reasonable person would expect PCG to pay

WCG for the right to copy and distribute *MOA* created by WCG with its resources. The third factor, therefore, weighs against fair use.

4. The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). It has been said that "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row,* 471 U.S. at 566–67, 105 S.Ct. 2218 (quoting Nimmer, Copyright § 1.10[D], at 1–87). This case presents a novel application of the fair use doctrine where the copyright owner is a not-for-profit organization. As might be expected, published case law deals with works marketed for profit. However, it cannot be inferred from that fact that the absence of a conventional market for a work, the copyright to which is held by a nonprofit, effectively deprives the holder of copyright protection. If evidence of actual or potential monetary loss were required, copyrights held by nonprofits would be essentially worthless. Religious, educational and other public interest institutions would suffer if their publications invested with an institution's reputation and goodwill could be freely appropriated by anyone.

The statute by its terms is not limited to market effect but includes also "the effect of the use on the *value* of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). As *Sony* states, "[e]ven copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have." *Sony,* 464 U.S. at 450, 104 S.Ct. 774. Those rewards need not be limited to monetary rewards; compensation may take a variety of forms. *Id.* at 447 n. 28, 104 S.Ct. 774 ("The copyright law does not require a copyright owner to charge a fee for the use of his works.... It is not the role of the courts to tell copyright holders the best way for them to exploit their copyrights").

WCG points out that those who respond to PCG's ads are the same people who would be interested in WCG's planned annotated version or any future republication of the original version. With an annotated *MOA,* WCG hopes to reach out to those familiar with Armstrong's teachings and those in the broader Christian community. PCG's distribution of its unauthorized version of *MOA* thus harms WCG's goodwill by diverting potential members and contributions from WCG. While the district court found that PCG's *MOA* and WCG's proposed annotated *MOA* "would not in any sense 'compete' in the same market," undisputed evidence shows that individuals who received copies of *MOA* from PCG are present or could be potential adherents of WCG. *MOA*'s value is as a marketing device; that is how PCG uses it and both PCG and WCG are engaged in evangelizing in the Christian community.

PCG argues that WCG's failure to exploit *MOA* for ten years and its lack of a concrete plan to publish a new version show that "*MOA* has no economic value to the WCG that the PCG's dissemination of the work would adversely affect." We disagree. Even an author who had disavowed any intention to publish his work during his lifetime was entitled to protection of his copyright, first, because the relevant consideration was the "potential market" and, second, because he has the right to change his mind. *See Salinger,* 811 F.2d at 99. WCG explained that it ceased distribution because the Church's position on various doctrines had changed, continued distribution would offend cultural standards of social sensitivity, and dissemination would perpetuate what the Church considered ecclesiastical error. For those reasons, WCG planned an annotated edition of *MOA.*[2]

---

2. Because the Church plans at some time to publish an annotated version of *MOA,* it is entitled to protection of its copyright. This is not a case of market failure, as PCG contends,

for the very reason stated in the article on which it relies:

> When an owner refuses to license because he is concerned that defendant's work will

Finally, PCG argues that if WCG published an annotated version it would be so different as not to be competitive with PCG's *MOA*. The argument, aside from being speculative, misses the point. The fact remains that PCG has unfairly appropriated *MOA* in its entirety for the very purposes for which WCG created *MOA*. We have found no published case holding that fair use protected the verbatim copying, without criticism, of a written work in its entirety. As the 1967 House Report notes, the market factor "must almost always be judged in conjunction with the other three criteria." H.R. REP. No. 83, at 35 (1967). Judge Pierre N. Leval has written:

> When the secondary use does substantially interfere with the market for the copyrighted work, as was the case in [*Harper & Row*], this factor powerfully opposes a finding of fair use. But the inverse does not follow. The fact that the secondary use does not harm the market for the original gives no assurance that the secondary use is justified. Thus, notwithstanding the importance of the market factor, especially when the market is impaired by the secondary use, it should not overshadow the requirement of justification under the first factor, without which there can be no fair use.

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1124 (1990).

On balance, the defense of fair use of *MOA* fails. The first three factors weigh in WCG's favor and the fourth factor is, at worst, neutral.

## III. PCG's DEFENSE UNDER THE RELIGIOUS FREEDOM RESTORATION ACT

PCG contends that the judgment should be affirmed on the independent

ground of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4. RFRA provides in relevant part that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability [subject to exceptions not relevant here]." 42 U.S.C. § 2000bb–1(a). RFRA "essentially requires the government to justify any regulation imposing a substantial burden on the free exercise of religion by showing that the regulation satisfies strict scrutiny." *Goehring v. Brophy*, 94 F.3d 1294, 1298 n. 4 (9th Cir.1996). PCG contends that the relief requested by WCG would substantially burden a central tenet of its religious doctrine, namely, distribution of *MOA* to current and potential adherents of its church. It also considers *MOA* to play an important role in its daily religious practice. The district court dismissed PCG's claim and affirmative defense under RFRA.

In *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court held that RFRA exceeded the authority of Congress under Section 5 of the Fourteenth Amendment to enforce the First Amendment. We have held, along with most other courts, that the Supreme Court invalidated RFRA only as applied to state and local law. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 832 (9th Cir.1999). We will continue to assume, without deciding, that RFRA is constitutional as applied to federal law. *See id.* at 833–34. Courts have interpreted RFRA as an amendment of existing federal statutes and thus a constitutional exercise of Congressional authority. In *In re Young*, 141 F.3d 854 (8th Cir.1998), the court found RFRA amended the bankruptcy code, precluding the bankruptcy trustee from avoiding a debtor's

---

substitute for his own work or derivative works, the owner is representing not only his own interest, but also the interest of his potential customers and thus the public interest. Market failure should be found only when the defendant can prove that the copyright owner would refuse to license out

of a desire unrelated to the goals of copyright-notably a desire to keep certain information from the public.
Wendy Gordon, *Fair Use As Market Failure: A Structural and Economic Analysis of the Betamax Case and its Predecessors*, 82 Colum. L. Rev. 1600, 1634 (1982).

tithes to his church. *Id.* at 861. *See also EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 470 (D.C.Cir.1996) (holding, pre-*Boerne,* that RFRA precluded application of Title VII to plaintiff whose position was the functional equivalent of a minister).

Whether the rationale of those cases can be extended to the copyright statute is an open question. It seems unlikely that the government action Congress envisioned in adopting RFRA included the protection of intellectual property rights against unauthorized appropriation. *Compare International Olympic Comm. v. San Francisco Arts & Athletics,* 781 F.2d 733, 737 (9th Cir.1986) (enforcement of federally-granted trademarks is not state action). We need not decide this knotty question, however, for in the context of this case PCG has failed to demonstrate that the copyright laws subject it to a substantial burden in the exercise of its religion. *See United States v. Grant,* 117 F.3d 788, 792 n. 6 (5th Cir.1997) (declining to address constitutionality of RFRA as applied to federal law because the government action at issue did not substantially burden the defendant's free exercise of religion). In its answer to the amended complaint, PCG admitted that it did not seek WCG's permission before copying *MOA.* This fact is confirmed by the certified minutes of the Advisory Council of Elders of the Church of God, submitted under the affidavit of the Secretary of the Church in support of WCG's motion for partial summary judgment, which states: "Prior to January, 1997, neither PCG, nor any of its agents, ever made an offer to purchase the copyrights of the MOA, or any of the Literary Works, nor did they request to purchase a license to exploit any rights therein, nor offered any royalties to do so."

A substantial burden "must be more than an inconvenience." *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995) (quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987) (internal citations

omitted), *aff'd sub nom. Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)).

> [T]he religious adherent, ... has the obligation to prove that a governmental regulatory mechanism burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; *the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.*

*Goehring,* 94 F.3d at 1299 (citation omitted) (alteration and emphasis in the original). Having to ask for permission, and presumably to pay for the right to use an owner's copyrighted work may be an inconvenience, and perhaps costly, but it cannot be assumed to be as a matter of law a substantial burden on the exercise of religion. In the absence of evidence that PCG's needs could not reasonably be accommodated under the copyright laws, we decline to hold that enforcement of those laws in these circumstances constitutes an unreasonable burden.[3]

## IV. CONCLUSION

The undisputed facts establish as a matter of law that PCG is not entitled to claim fair use. Because infringement by PCG of WCG's copyright is undisputed, barring fair use, WCG is entitled to a permanent injunction against the reproduction and distribution by PCG of *MOA.* Accordingly, we reverse the judgment for PCG in Nos. 99–55934 and 99–56489, and the denial of WCG's motion for a preliminary injunction in No. 99–55850, dismiss the appeal from the denial of WCG's motion for an injunction pending appeal in No. 99–56005 as moot, and remand for entry of a preliminary injunction pending a trial of any damages and final adjudication.

---

**3.** Because we decide that PCG has not met RFRA's substantial burden test, we need not decide whether the Copyright Act is the least restrictive means of serving a compelling governmental interest. *See* 42 U.S.C. § 2000bb–1(b).

Costs on appeal to WCG.

SO ORDERED.

BRUNETTI, Circuit Judge, dissenting:

I respectfully dissent and disagree with the majority's reversal of the district court's ruling on fair use.

The copyright dispute in this case arises from a change in religious doctrine of the Worldwide Church of God ("WCG"). This doctrinal shift produced a splinter church, the Philadelphia Church of God ("PCG"). PCG, which was founded by "defrocked" WCG ministers in 1989, seeks to adhere to WCG's original religious doctrine as espoused by its former leader Herbert W. Armstrong. In particular, PCG views *Mystery of the Ages* ("*MOA*"), a book written by Armstrong, as a divinely inspired text necessary for proper interpretation of the Bible. It is required reading for every member baptized into the PCG church and any prospective member prior to their attendance at church services.

WCG, on the other hand, has renounced many of Armstrong's teachings since shortly after his death in 1986. Although it had previously distributed approximately 1.25 million copies of *MOA* in book form and 8 million copies in serial form, WCG ceased publication and distribution of *MOA* in 1988. WCG then destroyed all excess copies of *MOA* in its inventory, retaining only archival and research copies. WCG has not printed or distributed any copies of *MOA* since 1988 and has no plans for publication or distribution of the work as originally written.

WCG took this course of action, at least in part, because it believes that *MOA* contains historical, doctrinal and social errors. Armstrong's successor at WCG explained that WCG has kept *MOA* out of print based on a "Christian duty" to keep Armstrong's doctrinal errors out of circulation. WCG has described *MOA* as "not in conformity with biblical teaching" and "racist." Although WCG claims that it plans to publish an annotated version of *MOA*, as of 1998, a decade after it ceased publishing *MOA*, testimony of WCG leaders demonstrates that the annotation of *MOA* is "not something that is going to be decided or happen any time soon." Apart from determining whether an annotation is financially feasible, WCG would need to take surveys of its membership, assess its priorities, determine the format, hire an author and researcher, and secure a publisher before any such annotation of *MOA* could be published.

PCG was founded because its ministers and members believe the religious doctrine espoused by Armstrong and as set forth in *MOA*. When WCG changed its church doctrine and renounced much of Armstrong's teachings, the founders and believers of PCG were forced from WCG as they could no longer practice their religious beliefs as set forth in *MOA*. It was WCG's doctrinal shift and renunciations that created the PCG and its need to publish *MOA*.

In light of these facts, this court must decide whether PCG's publication and distribution of *MOA* to church members and the public without charge beginning in January 1997 constitutes fair use of WCG's copyrighted work.

The fair use doctrine is an equitable rule of reason. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448 & n. 31, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). The statutory factors listed in 17 U.S.C. § 107 provide guidance in determining when the fair use doctrine applies. However, there are no bright-line rules and "each case raising the [fair use] question must be decided on its own facts." *Id.* at 448 n. 31, 104 S.Ct. 774 (quoting H.Rep. No. 94–1476). All four statutory factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

Here, PCG, a nonprofit organization, copied and distributed *MOA* free of charge to spread a religious message. PCG began publishing *MOA* because it was out of print and difficult to obtain through normal channels. It is undisputed that PCG

did not solicit any funds in connection with its distribution of *MOA*. PCG's use stands in sharp contrast to other uses found to be commercial under the first statutory factor. *See Campbell,* 510 U.S. at 583–85, 114 S.Ct. 1164 (parodic rap song sold to the public); *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (magazine printed excerpts of soon-to-be published presidential memoir); *Dr. Seuss Enterprises L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1403 (9th Cir.), *cert. dismissed,* 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997) (book-length parody of O.J. Simpson murder trial written in style of Dr. Seuss and intended for public sale); *Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1152–53 (9th Cir.1986) (magazine's parody of prominent minister mailed to minister's supporters together with letters soliciting donations and displayed on television as part of a fundraising drive).

Despite PCG's nonprofit status, its free-of-charge distribution of *MOA,* and the religious purpose behind such distribution, the majority concludes that the first statutory factor militates against a finding of fair use because PCG's use is not transformative and PCG profits by using *MOA* as a marketing tool to attract new tithing members. As an initial matter, PCG's use need not be transformative to qualify as fair use. *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. In this case, altering or adding to *MOA* would defeat PCG's religious purpose because it believes that *MOA* is a divinely inspired text. As to the profitability of PCG's use, WCG does not contest PCG's assertion that unsolicited donations in response to the distribution of *MOA* fail to come close to covering the enormous expense of printing *MOA.* WCG itself has stated that the costly production of *MOA* was one of the reasons it ceased publication. In my view, the noncommercial and religious elements of PCG's use overwhelm any commercial aspects and weigh in favor of fair use under the first statutory factor. Moreover, the fact that *MOA* had been out of print for nine years at the time of PCG's

publication and could only be obtained through some libraries and used bookstores also supports a finding of fair use under the first factor. *See Harper & Row,* 471 U.S. at 553, 105 S.Ct. 2218 ("A key, though not necessarily determinative factor in fair use is whether or not the work is available to the potential user. If the work is out of print and unavailable for purchase through normal channels, the user may have more justification for reproducing it ....") (quoting S.Rep. No. 94–473 (1975)); *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1264 n. 8 (2d Cir.1986) (out-of-print status of copyrighted book supports fair use determination).

The second and third statutory factors are mostly irrelevant to this case. For example, as a religious text, Armstrong's *MOA* defies easy classification under the second factor as either informational or creative. *Compare New Era Publications, Int'l v. Carol Publishing Group,* 904 F.2d 152, 157 (2d Cir.1990) ("the quoted works—which deal with [Scientology founder L. Ron] Hubbard's life, his views on religion, human relations, the Church, etc.—are more properly viewed as factual or informational") *and Religious Technology Center v. Netcom On–Line Com. Services, Inc.,* 923 F.Supp. 1231, 1246 (N.D.Cal.1995) (policy letters of Hubbard Communication Office and works which are part of the methodology of "applied religious philosophy" are primarily functional or instructive, but other Hubbard works which appear more creative or original deserve greater fair use protection) *with Bridge Publications, Inc. v. Vien,* 827 F.Supp. 629, 635–36 (S.D.Cal.1993) ("the undisputed evidence shows that L. Ron Hubbard's works are the product of his creative thought process, and not merely informational"). As to the amount of copying, even wholesale copying does not weigh against a finding of fair use under the third factor if it is consistent with the noncommercial purpose and character of the use. *Sony,* 464 U.S. at 449–50, 104 S.Ct. 774. In contrast to *Hustler* where the purposes of raising funds and rebut-

ting derogatory information could have been served by less than wholesale copying of the parody, PCG's purpose in seeking to spread the religious message of Armstrong's divinely inspired text, like the nonprofit purpose of home videotaping in *Sony Corp.*, requires copying of the text as a whole. Accordingly, neither the second nor the third statutory factor militate against a finding of fair use.

Even though PCG's use is primarily noncommercial and religious, such use could not be considered fair use in light of the fourth and most important statutory factor if it impaired the value or marketability of WCG's original *MOA* or its proposed annotated *MOA*. Yet, WCG has intentionally kept *MOA* out of circulation and made no reasonable effort to create an annotated version of *MOA* in the decade following its decision to cease publication. WCG originally distributed *MOA* free of charge as a way of spreading the religious message of its then current leader Armstrong. Like PCG, WCG used *MOA* as an educational and evangelical tool and may have obtained an indirect financial benefit by attracting tithing members. WCG's decision to cease publication of *MOA,* destroy inventory copies, and disavow *MOA*'s religious message in the context of its doctrinal shift as a church demonstrates that *MOA* is no longer of value to WCG for such purposes, regardless of PCG's actions. Because WCG has admitted that it has no plans to publish or distribute *MOA* as originally written, there can be no market interference.

Nor has WCG shown that "some meaningful likelihood of future harm exists" as to the potential market for WCG's planned publication of an annotated version of *MOA. See Sony Corp.,* 464 U.S. at 451, 104 S.Ct. 774. In *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253 (2d Cir.1986), the court determined that publication of a book opposing abortion which used quotations from an earlier book tending to view abortion in a favorable light did not economically harm the earlier work. The court held that the plans for a second edition of the earlier work was not affected by the publication of the infringing work in part because "it is unthinkable that potential customers for a series of sympathetic interviews on abortion and adoption would withdraw their requests [for a second edition] because a small portion of the work was used in an essay sharply critical of abortion." *Id.* at 1264, 803 F.2d 1253. It continued by stating that "[t]his conclusion is supported by our finding that the two works served fundamentally different functions, by virtue both of their opposing viewpoints and disparate editorial formats." *Id.*

Here, as in *Maxtone–Graham,* the functions served by *MOA* and the proposed annotation as well as their potential markets are different. In contrast to PCG's evangelical use, the central purpose behind WCG's proposed annotated version of *MOA* is to identify Armstrong's historical, doctrinal, and social errors. The target markets for the two versions of *MOA* are different because it simply does not make sense for WCG to widely distribute an annotated *MOA* highlighting the errors of the original *MOA* to the general public in order to recruit new members. Unlike a publication which would provide a straightforward explanation of WCG's religious doctrines for the purposes of recruitment, an annotated version of *MOA* would require a reader to become familiar with the text of the original *MOA* and then to read WCG's response to or criticism of Armstrong's religious views in order to discover WCG's doctrines. Indeed, because WCG hopes to use an annotated *MOA* to reach out to those familiar with Armstrong's teachings, PCG's use creates a larger potential market for an annotation rather than interfering with it. Moreover, the failure of WCG to make any reasonable progress on the annotation over the course of a decade as well as WCG's belief that it has a Christian duty to keep Armstrong's doctrinal errors out of circulation tends to undermine the credibility of WCG's intention to publish any such annotation.

Because there is no evidence, beyond the mere speculation by WCG's leaders,

that PCG's use has a "demonstrable effect on the potential market for, or value of," *MOA* or WCG's proposed annotation, the use "need not be prohibited in order to protect the author's incentive to create." *Sony Corp.*, 464 U.S. at 450, 104 S.Ct. 774. The prohibition of PCG's noncommercial, religious use "would merely inhibit access to ideas without any countervailing benefit." *Id.* at 450–51, 104 S.Ct. 774. Accordingly, the fourth statutory factor also supports a finding of fair use.

In this lawsuit, WCG appears less interested in protecting its rights to exploit *MOA* than in suppressing Armstrong's ideas which now run counter to church doctrine. Although the Supreme Court has recognized that "freedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all,'" it does not "suggest that this right not to speak would sanction an abuse of the copyright owner's monopoly as an instrument to suppress facts." *Harper & Row*, 471 U.S. at 559, 105 S.Ct. 2218.

In light of this principle and the statutory factors discussed above, I conclude that the district court did not err in granting partial summary judgment to PCG because it properly found that PCG's distribution of *MOA* constitutes fair use.