**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NOELIA LORENZO MONGE, an
individual; JORGE REYNOSO, an
individual,
          *Plaintiffs-Appellants,*

          v.

MAYA MAGAZINES, INC., a Florida
Corporation; MAYA PUBLISHING
GROUP, LLC, a Florida Limited
Liability Company,
          *Defendants-Appellees.*

No. 10-56710

D.C. No.
2:09-cv-05077-R-SS

NOELIA LORENZO MONGE, an
individual; JORGE REYNOSO, an
individual,
          *Plaintiffs-Appellants,*

          v.

MAYA MAGAZINES, INC., a Florida
Corporation; MAYA PUBLISHING
GROUP, LLC, a Florida Limited
Liability Company,
          *Defendants-Appellees.*

No. 11-55483

D.C. No.
2:09-cv-05077-R-SS

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 6, 2012—San Diego, California

Filed August 14, 2012

9169

Before: M. Margaret McKeown and Milan D. Smith, Jr.,
Circuit Judges, and Rudi M. Brewster,
Senior District Judge.*

Opinion by Judge McKeown;
Dissent by Judge M. Smith

---

*The Honorable Rudi M. Brewster, Senior District Judge for the South-
ern District of California, sitting by designation.

## COUNSEL

Michael D. Kuznetsky (argued), Kuznetsky Law Group, P.C., Universal City, California, for the plaintiffs-appellants.

D. Fernando Bobadilla (argued), The Bobadilla Law Firm, Miami, Florida; Angela C. Agrusa and Allen P. Lohse, Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP, Los Angeles, California, for the defendants-appellees.

## OPINION

McKEOWN, Circuit Judge:

This appeal reads like a telenovela, a Spanish soap opera. It pits music celebrities, who make money by promoting

themselves, against a gossip magazine, that makes money by publishing celebrity photographs, with a paparazzo, who apparently stole the disputed pictures, stuck in the middle. Noelia Lorenzo Monge and Jorge Reynoso ("the couple"), Latin American celebrities, claim that Maya Magazines, Inc. and Maya Publishing Group, LLC (collectively "Maya" or "the magazine") infringed their copyrights by publishing previously unpublished photos of their clandestine wedding in "TVNotas," a Spanish-language celebrity gossip magazine. The district court granted Maya summary judgment on the ground that publication of the images was fair use under the Copyright Act of 1976. We disagree and reverse. The tantalizing and even newsworthy interest in the photos does not trump a balancing of the fair use factors. Simply put, Maya did not sustain its burden of establishing that its wholesale, commercial use of the previously unpublished photos constituted fair use.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. THE CAST

Noelia Lorenzo Monge is a pop singer and model. Jorge Reynoso is her manager and husband, and a music producer. Oscar Viqueira is a paparazzo who occasionally worked as a driver and bodyguard for the couple during their visits to Miami. Maya publishes multiple magazines, including the celebrity gossip magazine "TVNotas." In the past, Maya has paid Monge to pose for pictures published in its magazine, "H Para Hombres." Reynoso was paid $25,000 for photos of his wedding to his former wife Pilar Montenegro, as well as $40,000 for photos of his vacation in Paris with Montenegro.

### II. THE SET

Monge and Reynoso were married at the "Little White Wedding Chapel" in Las Vegas, Nevada on January 3, 2007. Valuing their privacy, and Monge's image as a young, single

pop singer, the couple went to great lengths to keep the wedding a secret: only the minister and two chapel employees witnessed the ceremony. Using Monge's camera, chapel employees took three photos of the wedding; later that night at least three more photos of Monge and Reynoso in their nuptial garb were also taken. The pictures were intended for the couple's private use. For two years Monge and Reynoso succeeded in keeping their wedding a secret, even from their families.

In the summer of 2008, Reynoso used Viqueira's sport utility vehicle. Viqueira claims that after Reynoso returned the car, Viqueira found a memory chip in the ashtray. When Viqueira looked at the files on the memory chip, he found the photos of the couple's secret wedding, along with an assortment of other photos and videos. Viqueira tried to capitalize on the files to extort money he claimed Reynoso owed him. When this plan failed, in February 2009, Viqueira sold to Maya all of the electronic files he had taken "to recuperate the payment for [his] work." The price was $1,500. The couple testified, and Maya does not contest, that Viqueira did not have permission to take or sell any of the images on the memory chip.

## III.   THE DRAMA

Reynoso received a phone call from his mother in February 2009, berating him for getting married without telling her. Intent on secrecy, Reynoso denied the marriage to his own mother, but to no avail: She had already seen the wedding photos in a gossip magazine. Maya had published six of the stolen photos—three of the wedding ceremony and three of the wedding night—in Issue 633 of TVNotas. Prior to Issue 633, the photos were unpublished. The headline on the front cover of the magazine stated: "The Secret Wedding of Noelia and Jorge Reynoso in Las Vegas."[1] The byline stated: "We

---

[1]The record contains English translations of the statements made in the Spanish-language magazine.

even have photos of their first night as a married couple!" This text was positioned beside the wedding photo on the cover. Three photos were reproduced on the cover: one showing Monge lying on a bed revealing her underwear; one of Reynoso smoking a cigar in front of a neon Playboy logo; and one depicting the newly-married couple.

Inside the magazine, the photos were featured over a two-page spread. "Apparently, the couple married in Las Vegas in January 2007!" was written on the top of the spread. "First and exclusive photos of the secret wedding of Noelia and Jorge Reynoso" was also printed in large font on the spread.

The left side of the spread was comprised of one large wedding photo, a reprint from the cover. Printed on top of this photo was: "Only in TVNotas"; and the caption read: "In fact, a lot has been said about a supposedly secret wedding in Las Vegas, Nevada, that took place in January 2007, but until now, no one had shown photos of that memorable day. TVNotas got a hold of those photos and shows them to you now, exclusively."

The right side of the spread was comprised of four photos. The photos showed the couple next to a priest, kissing in wedding attire, and at a bar. The picture of Monge on a bed with her underwear showing, also published on the cover, was repeated. The footer of this page stated: "Although the couple has declined to confirm their marriage, these photos that we got speak for themselves."

These six images were the only ones Maya published from the assortment of approximately four hundred images and three videos obtained from Viqueira. Maya did not publish other supporting evidence such as a marriage certificate, choosing instead to rely solely on the sensational photos. The couple claims that the three wedding photos published comprise every wedding photo taken, and that the three photos of the wedding night comprise almost every photo of the wed-

ding night. Maya does not challenge either contention. Nor is there any dispute that Maya generated revenue from sales of Issue 633. Maya also admits that, in the past, it has paid for exclusive rights to publish pictures of celebrity weddings, including other celebrity weddings depicted in Issue 633.

## IV.  THE COURT PROCEEDINGS

Soon after publication of the pictures, the couple registered copyrights in five of the six published photos—all the published pictures, except the one where the couple appears together in front of a Playboy logo.[2] Monge and Reynoso then filed a complaint against Maya asserting claims for copyright infringement, statutory misappropriation of likeness, and common law misappropriation of likeness.

The district court dismissed the misappropriation of likeness claims and struck the couple's claims for statutory damages under the Copyright Act. The parties filed cross-motions for summary judgment. The district court granted Maya's motion for summary judgment based on fair use under 17 U.S.C. § 107, and also granted Maya's motion for attorney's fees and costs.

## ANALYSIS

The sole issue on appeal is whether the district court properly granted summary judgment in favor of Maya predicated on the fair use doctrine. We review de novo the district

---

[2]Because only fair use is at issue, we assume the legitimacy of the couple's copyright in each of the five photos for which they provided copyright registrations. *See* 17 U.S.C. § 410(c) (registration serves as prima facie evidence of validity); *id.* § 411(a) (federal registration is required before bringing an infringement action). We express no opinion as to the ownership of copyright regarding the sixth photo nor do we express an opinion as to the ultimate copyright status of any of the photos. *See United Fabrics Int'l, Inc. v. C & J Wear, Inc.*, 630 F.3d 1255 (9th Cir. 2011).

court's finding of fair use, a mixed question of law and fact. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2003).

## I.   THE FAIR USE DOCTRINE

The fair use doctrine has been called "the most troublesome in the whole law of copyright." *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661, 662 (2d Cir. 1939) (per curiam). This affirmative defense presumes that unauthorized copying has occurred, and is instead aimed at whether the defendant's use was fair. As with all affirmative defenses, Maya as the defendant bears the burden of proof. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985). Despite its claim that it purchased the photos in good faith, "the innocent intent of the defendant constitutes no defense to liability." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.08[B][1] (Matthew Bender rev. ed. 2011) (footnote omitted).

Fair use is a central component of American copyright law. Although its roots, like copyright law itself, may be traced to English courts,[3] the doctrine first took hold in this country in Justice Story's opinion in *Folsom v. Marsh*, 9 F. Cas. 342 (No. 4901) (C.C.D. Mass. 1841). He wrote that "a fair and bona fide abridgement of an original work[ ] is not a piracy of the copyright of the author." *Id.* at 345. Foreshadowing future commentary on fair use, Justice Story noted that "what constitutes a fair and bona fide abridgement, in the sense of the law, is one of the most difficult points, under particular circumstances, which can well arise for judicial discussion." *Id.* Justice Story characterized copyright cases as approaching "the metaphysics of the law, where the distinctions are, or at least may be, very subtle and refined, and, sometimes, almost evanescent." *Id.* at 344.

---

[3]Matthew Sag, *The Prehistory of Fair Use*, 76 BROOK. L. REV. 1371, 1372-73 (2011).

**[1]** Fair use became more concrete when it was codified in the Copyright Act of 1976: "[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. Courts are directed to determine fair use on the basis of the following non-exclusive factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* In 1992, Congress amended the fair use section to address the status of unpublished works: "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." *Id.*

In the years following the 1976 Act, courts have decided countless cases involving the fair use doctrine. Some commentators have criticized the factors, labeling them "billowing white goo"[4] or "naught but a fairy tale,"[5] echoing courts that threw up their hands because the doctrine is "so flexible as virtually to defy definition." *Princeton Univ. Press v. Mich.*

---

[4]Jessica Litman, *Billowing White Goo*, 31 Colum. J.L. & Arts 587, 596 (2008).

[5]David Nimmer, *"Fairest of Them All" & Other Fairy Tales of Fair Use*, 66 Law & Contemp. Probs. 263, 287 (2003).

*Doc. Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996) (citation omitted). A leading treatise in this area notes that the statute provides "no guidance as to the relative weight to be ascribed to each of the listed factors," and, in the end, "courts are left with almost complete discretion in determining whether any given factor is present in any particular use." *Nimmer on Copyright* § 13.05[A] (footnotes omitted).

We acknowledge the porous nature of the factors but nonetheless recognize that we are obliged to make sense of the doctrine and its predicates. Over time, there has been a shift in analytical emphasis in the fair use factors, in large part due to several key Supreme Court cases. The relative importance of factor one—"the purpose and character" of the use—and factor four—"the effect of the use upon the potential market"—has dominated the case law. Because these factors are also significant here, we take the time to discuss the recent evolution of the doctrine. Two key Supreme Court cases guide our analysis: *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985), and *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994).

*Harper & Row* is particularly instructive because it involved the unpublished memoirs of a public figure, President Ford. Just before Time Magazine was scheduled to publish excerpts from President Ford's forthcoming book, The Nation magazine published an article that included, from an unauthorized source, verbatim quotations from the book. The Court held that "use of the[ ] verbatim excerpts from the unpublished manuscript was not a fair use." 471 U.S. at 569.

In discussing the fair use factors, the Court illuminated several points that bear on this case. Commenting on the public interest issue, the Court faulted the court of appeals for "concluding that The Nation's use of the copyrighted material was excused by the public's interest in the subject matter." *Id.* In that vein the Court admonished:

It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public. . . . [W]e see no warrant for expanding the doctrine of fair use to create what amounts to a public figure exception to copyright.

*Id.* at 559-60. Similar to our case, the confidentiality of the unpublished works was central in *Harper & Row*. Brushing aside The Nation's effort to sidestep liability, the Court wrote that "[a] use that so clearly infringes the copyright holder's interests in confidentiality and creative control is difficult to characterize as 'fair.' " *Id.* at 564.

Echoing its then-recent decision in *Sony Corp. of Am. v. Universal City Studios*, *Inc.*, 464 U.S. 417 (1984), *superseded on other grounds by statute*, 17 U.S.C. § 1201, the Court synthesized the fourth factor, the effect on the potential market as "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. In its conclusion, the Court cautioned as follows: "Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory license' permitting unfettered access to the unpublished copyrighted expression of public figures." *Id.* at 569. In other words, the Court did not give a fair use free pass to news reporting on public figures, nor did it embrace the notion that the unpublished nature of the work is without consequence.

Almost ten years later, the Court returned to the fair use doctrine in *Campbell*, 510 U.S. 569. The case arose in the context of a parody by 2 Live Crew of the Roy Orbison and William Dees song "Oh, Pretty Woman." The Court addressed the first factor and highlighted "that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry . . . ." *Id.* at 584. It debunked the notion that *Sony* called for a "hard evidentiary presumption" that commercial use is presumptively unfair. *Id.* Instead, the Court harkened back to its explanation in *Harper v. Row*

that commercial use "tends to weigh against a finding of fair use," and said "[b]ut that is all." *Id.* at 585 (internal quotation marks omitted).

The Court also clarified the role of the fourth factor, market harm, and criticized reliance on *Sony* to support a presumption of market harm in the event of transformative commercial use. It noted that "*Sony*'s discussion of a presumption contrasts a context of verbatim copying of the original in its entirety for commercial purposes, with the noncommercial context of *Sony* itself (home copying of television programming)." *Id.* at 591. Of course, commercial use may tip the scale toward market harm, but like the other factors, it "may be addressed only through a 'sensitive balancing of interests.' " *Id.* at 590 n.21 (citation omitted).

Against this backdrop, we address the four fair use factors.

## II.    FAIR USE FACTORS

### A.    PURPOSE AND CHARACTER OF THE USE

The first factor includes three principles that simultaneously complement and yet are in tension with one another in this case: news reporting; transformation; and commercial use.

#### 1.    News Reporting

The preamble to the fair use statute lists "news reporting" as an illustrative basis supporting fair use under this factor. 17 U.S.C. § 107. We have little doubt that the gossip magazine's sensational coverage of the wedding qualifies as news reporting. Our role in this regard is not as a literary critic. *Campbell*, 510 U.S. at 582 (whether "in good taste or bad does not and should not matter to fair use"). While the parties agree that the pictures at issue are newsworthy, we must nevertheless proceed cautiously because "[t]he promise of copyright would be

an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the [work]." *Harper & Row*, 471 U.S. at 557.

**[2]** Although news reporting is an example of fair use, it is not sufficient itself to sustain a per se finding of fair use. The "fact that an article arguably is 'news' and therefore a productive use is simply one factor in a fair use analysis." *Id.* at 561. In other words, fair use has bounds even in news reporting, and no per se "public interest" exception exists. *See, e.g.*, *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 307 (3d Cir. 2011) ("[N]ews reporting does not enjoy a blanket exemption from copyright. News organizations are not free to use any and all copyrighted works without the permission of the creator simply because they wish to report on the same events a work depicts."); *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (allowing publication of three pictures for news purposes, but clarifying that "[t]his is not to say that . . . use of the photographs was necessarily fair merely because the photographs were used for news purposes, nor does it establish a general 'newsworthiness' exception."). Because Maya cannot simply take fair use refuge under the umbrella of news reporting, we analyze Maya's coverage in light of two other considerations: the degree of transformation occasioned by Maya's use; and the commercial nature of its use.[6]

---

[6]In evaluating the "purpose and character" factor, we apply "the general rule that a party claiming fair use must act in a manner generally compatible with principles of good faith and fair dealing." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 n.8 (9th Cir. 2007) (citing *Harper & Row*, 471 U.S. at 562-63). The couple claims that the magazine acted in bad faith by failing to: seek permission from them; confirm that the copyrights in the images belonged to Viqueira; and seek *any* documentation as to ownership. Maya presents evidence, however, that it procured a written copyright assignment from Viqueira, and argues that it had no reason to believe that the known paparazzo did not have rights to the photos. While the couple's arguments may call into question Maya's good faith, Maya's actions do "not amount to an abuse of the good faith and fair dealing underpinnings of the fair use doctrine." *Id.* Application of the defense is not foreclosed.

## 2. Transformation

**[3]** Transformation is a judicially-created consideration that does not appear in the text of the statute. According to *Campbell*:

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supercede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."

510 U.S. at 579 (citations and quotation marks omitted). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

Transformation in the news reporting context has been litigated repeatedly in our circuit, often involving the Los Angeles News Service. In *L.A. News Serv. v. Reuters Television Int'l*, we stated that despite the newsworthiness of the videos at issue, which documented a beating during a riot in Los Angeles, their mere rebroadcast was not in itself transformative: "Although [Reuters's] service does have a news reporting purpose, its use of the works was not very transformative. Reuters copies footage and transmits it to news reporting organizations; Reuters does not explain the footage, edit the content of the footage, or include editorial comment." 149 F.3d 987, 993 (9th Cir. 1998). Similarly, a news station's broadcast of an extraordinarily timely news segment concerning ongoing riots related to the Rodney King beating was held unfair: Even though the news station "apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the [ ] work valuable — a clear, visual recording of the beating itself." *L.A. News Serv. v.*

*KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997). Minor changes, such as placing "voice-overs" on video clips, do not "necessarily transform a work." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628-29 (9th Cir. 2003), *overruled on other grounds as stated in Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam).

Arrangement of a work in a photo montage, however, can be transformative where copyrighted material is incorporated into other material. For example, the use of a brief segment of a riot clip in a promotional video was deemed to be fair use. *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924 (9th Cir. 2002), *as amended*, 313 F.3d 1093. Nonetheless, "[m]erely plucking the most visually arresting excerpt from [ ] nine minutes of footage cannot be said" to be transformative, but

> inclusion of the clip in the video montage that introduced the Prime Time Justice program, following editing for dramatic effect, has a better claim to be within the scope of "transformation." The development of the montage at least plausibly incorporates the element of creativity beyond mere republication, and it serves some purpose beyond newsworthiness.

*Id.* at 939; *see also Murphy*, 650 F.3d at 306 (disallowing copying of unaltered image because there was "no meaningful distinction between the purpose and character" of the creator's use and the infringer's use of reporting news).

**[4]** The pictures here are a "clear, visual recording" of the couple's wedding and wedding night. *KCAL-TV Channel 9*, 108 F.3d at 1122. Because publication of photographic evidence that constitutes proof of a newsworthy event is not automatically fair use, we turn to the degree to which Maya's use transformed the works. Each of the individual images was reproduced essentially in its entirety; neither minor cropping

nor the inclusion of headlines or captions transformed the copyrighted works. The reasoning regarding voice-overs from *Elvis Presley Enterprises* applies with equal vigor to headlines and captions over still images. 349 F.3d at 628-29.

The individual images were marginally transformed, however, in other ways. The text and article accompanying the photos, as well as their arrangement in a photo montage, may give the pictures "a further purpose." *CBS Broad., Inc.*, 305 F.3d at 938 (citation and quotation marks omitted). *Campbell* makes clear that the "heart" of a claim for transformative use is "the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." 510 U.S. at 580. Of course, in *Campbell*, the question related to parody, a direct comment aimed at the original song. The dissent's vivid description of the copyrighted photos does not undermine the conclusion that there was no real transformation of the photos themselves. Nor can it be said, as in *Campbell*, that Maya created a new work based on the photos.

Even if the photos were not physically or creatively transformed, Maya claims that publication of the photos as an exposé amounted to transformation. In other words, Maya's publication transformed the photos from their original purpose—images of a wedding night—into newsworthy evidence of a clandestine marriage.[7] In support, Maya relies heavily on *Núñez*, a First Circuit case that is distinguishable. 235 F.3d 18. In *Núñez*, a photographer sued a newspaper that published his copyrighted images of a woman that had won the title of "Miss Universe Puerto Rico." *Id.* at 21. In at least

---

[7]While the couple undisputedly kept the wedding a secret, contrary to the dissent's assertion, the record contains no evidence that the couple made affirmative representations about their marital status. There is no evidence that the couple repeatedly denied their marriage or made other public statements to the contrary. The district court erred in making such factual findings and likewise erred in inferring such representations during the summary judgment proceeding.

one photo, the woman appeared naked or nearly naked. After a local television station displayed the risqué photographs, the model was interviewed about "her fitness to retain the Miss Universe Puerto Rico crown." *Id.* Soon after, a local newspaper published the photographs without permission, along with several articles about the controversy. *Id.*

**[5]** Although *Núñez* also involved news reporting, the similarities end there. The controversy there was whether the salacious photos themselves were befitting a "Miss Universe Puerto Rico," and whether she should retain her title. In contrast, the controversy here has little to do with photos; instead, the photos here depict the couple's clandestine wedding. The photos were not even necessary to prove that controverted fact—the marriage certificate, which is a matter of public record, may have sufficed to inform the public that the couple kept their marriage a secret for two years. Indeed, "[t]he public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts." *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos. Inc.*, 621 F.2d 57, 61 (2d Cir. 1980). Under copyright law, Maya possesses "an unfettered right to use any factual information revealed [through the photos] for the purpose of enlightening its audience, but it can claim no need to bodily appropriate [the couple's] expression of that information by utilizing portions of the actual [photos]." *Id.* (internal quotation marks omitted). Unlike here, in *Núñez* "the pictures were the story," and the newspaper in *Núñez* did not seek to "manufacture newsworthiness," nor did it "scoop" the story. 235 F.3d at 22.**[8]**

---

**[8]**Contrary to the dissent's concern, where the content of the work *is* the story, such as a controversy over a congressman's "salacious" photos or a golf celebrity's "sext" messages, news reporters would have a better claim of transformation, which, far from being determinative, is simply one of the factors we consider in the fair use analysis. *See Murphy*, 650 F.3d at 307-08 ("Under many circumstances, reporters will indeed be able to claim a fair use defense against claims of infringement."). In any event, neither example the dissent provides pertains to a "private," unpublished work—both Tiger Woods and Congressman Weiner distributed their "masterpieces" to others.

Also significant, the work in *Núñez* had already been distributed when the infringement occurred. *Id.* at 20.

We reiterate what the First Circuit emphasized, namely that there is no "general 'newsworthiness' exception." *Id.* In other words, newsworthiness itself does not lead to transformation. The dissent's doomsday prediction about the impact of our decision on investigative journalism is overblown. *See Harper & Row*, 471 U.S. at 561 ("The issue is not what constitutes news, but whether a claim of newsreporting is a valid fair use defense to an infringement of *copyrightable expression*. The [magazine] has every right to seek to be the first to publish information. But [the magazine] went beyond simply reporting uncopyrightable information and actively sought to exploit the headline value of its infringement, making a news event out of its unauthorized first publication of a noted figure's copyrighted expression." (internal quotation marks and citation omitted)).

Maya's purpose in publishing the photos was to expose the couple's secret wedding, which was at odds with the couple's purpose of documenting their private nuptials. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (using "images in a new context to serve a different purpose" may be transformative). But even an infringer's separate purpose, by itself, does not necessarily create new aesthetics or a new work that "alter[s] the first [work] with new expression, meaning or message." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 579). A "difference in purpose is not quite the same thing as transformation, and *Campbell* instructs that transformativeness is the critical inquiry under this factor." *Id.*

**[6]** Maya did not transform the photos into a new work, as in *Campbell*, or incorporate the photos as part of a broader work, as in *CBS Broadcasting*. Instead, unlike the thumbnail images at issue in *Perfect 10*, Maya left the inherent character of the images unchanged. *See Perfect 10, Inc.*, 508 F.3d at

1165 ("a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool."). Maya's use—wholesale copying sprinkled with written commentary—was at best minimally transformative. *See* Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990) (use of copyrighted material that "merely repackages or republishes the original" is unlikely to be fair use).

### 3.  Commercial Use

Maya's use was undisputedly commercial in nature. The gossip magazine makes no pretense that it is educational. It is a commercial publication.

**[7]** The Supreme Court has stated that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony*, 464 U.S. at 451. Commercial use is a "factor that tends to weigh against a finding of fair use" because "the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. There is no dispute here that Maya is motivated by profits, and in fact profited from the publication of the pictures.

**[8]** Although Maya's reporting on the clandestine wedding was newsworthy, newsworthiness, by itself, is insufficient to demonstrate fair use. Similarly, exposing truths in the public interest is not a bell weather of fair use. *See Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629-30 (7th Cir. 2003) (denying fair use defense for a newspaper that published in their entirety six "secure" tests—tests that are generally kept secret—to demonstrate their shortcomings). Maya's minimal transformation of the photos is substantially undercut by its undisputed commercial use. *See Infinity Broadcast Corp.*, 150 F.3d at 109 (the different, and possibly beneficial, purposes of the copying is outweighed by the total absence of transforma-

tiveness). On balance, the first factor is at best neutral, and does not support Maya's claim of fair use.

## B. NATURE OF THE COPYRIGHTED WORK

**[9]** Under the second factor, we address two aspects of the work: the extent to which it is creative and whether it is unpublished. *Harper & Row*, 471 U.S. at 563-64.

**[10]** Photos are generally viewed as creative, aesthetic expressions of a scene or image and have long been the subject of copyright. *See* 17 U.S.C. § 102(a)(5) (extending copyright protection to "pictorial, graphic, and sculptural works"). In the seminal case protecting photos, the Supreme Court held that a photographic portrait of Oscar Wilde was entitled to copyright protection because of various creative elements employed by the photographer. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884). Although the Court expressly declined to rule on whether "the ordinary production of a photograph" necessarily exhibits sufficient originality to claim copyright, *id.* at 59, our court has recognized that individual photos merit copyright protection. *See, e.g.*, *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074 (9th Cir. 2000) ("Indeed, the idea that photography is art deserving [copyright] protection reflects a longstanding view of Anglo-American law.").

Admittedly, the point-and-shoot images here are hardly the work of famous photographers like Richard Avedon, Diane Arbus, or Annie Liebovitz. But neither are they entirely factual in nature, as Maya argues. Simply because a photo documents an event does not turn a pictorial representation into a factual recitation of the nature referenced in *Harper & Row*. Photos that we now regard as iconic often document an event —whether the flight of the Wright Brothers' airplane, the sailor's kiss in Times Square on V-J Day, the first landing on the moon, or the fall of the Berlin Wall. *See generally* PHOTOS THAT CHANGED THE WORLD (Prestel Verlag 2000).

**[11]** Although the published photos were not highly artistic in nature, they do have a defining and common characteristic —until Issue 633 hit the stands, they were unpublished. We pointedly note that we address the unpublished status of the photos only under copyright principles, not privacy law. *See Bond v. Blum*, 317 F.3d 385, 395 (4th Cir. 2003) ("the protection of privacy is not a function of the copyright law."). "It may seem paradoxical to allow copyright to be obtained in secret documents, but it is not. . . . [F]ederal copyright is now available for unpublished works that the author intends to never see the light of day." *Chicago Bd. of Educ.*, 354 F.3d at 627. We begin with a basic principle: "the unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use." *Harper & Row*, 471 U.S. at 554 (quotation and other marks omitted). The Court specifically honed in on the unpublished status of the work, calling it "a critical element of its 'nature.' " *Id.* at 564. Accordingly, "*[u]nder ordinary circumstances*, the author's right to control the first public appearance of his undisseminated expression *will outweigh* a claim of fair use." *Id.* at 555 (emphases added).

The Court has been silent on what sort of "extraordinary circumstances" overcome the presumption against pre-publication fair use; however, under a 1992 amendment to the Copyright Act, "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all [four] factors." 17 U.S.C. § 107. The 1992 addition to the fair use statute undid a line of Second Circuit cases that created a bar on fair use where unpublished letters were being used in biographies. *See New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 583 (2d Cir. 1989); *Salinger v. Random House, Inc.*, 811 F.2d 90, 99-100 (2d Cir. 1987). The congressional report noted that it was "not the Committee's intention to alter the weight currently given by the courts to the unpublished nature of a work under the second fair use factor. The general principles regarding fair use of unpublished works set forth by the Supreme Court in *Harper & Row*

*v. Nation Enterprises* still apply." H.R. Rep. No. 102-286, at 9 (1992), reprinted in 1992 U.S.C.C.A.N. 2553, 2561. The Senate confirmed the vitality of *Harper & Row*: "we intend to roll back the virtual per se rule of *Salinger* and *New Era*, but we do not mean to depart from *Harper & Row*." S. Rep. No. 102-141, at 5-6 (1991).

**[12]** We are unable to discern anything extraordinary about the situation here, and agree with the district court that Maya's "publication undoubtedly supplanted Plaintiffs' right to control the first public appearance of the photographs." *Contra Núñez*, 235 F.3d at 23 ("[Defendant] did not aim to use the photographs to compete with Núñez, nor to supplement his right of first production"). This finding further distinguishes *Núñez*, where the works were hardly confidential or secret and "had already been distributed" when the infringement occurred. *Id.* at 21, 23. In contrast, Maya's headlines bragged about its exclusive photo spread of never before seen images.

**[13]** In analyzing the second factor, the nature of the work, we balance the copyright protection received by marginally creative works with the Supreme Court's clear recognition that the unpublished status of the work is a "critical element." These aspects counter-balance each other, and because the case is not exceptional, we apply the Supreme Court's admonition that with respect to unpublished works, this factor "outweighs" Maya's claim of fair use. *See Harper & Row*, 471 U.S. at 555.

## C. Amount and Substantiality of the Portion Used

**[14]** The third statutory factor in the fair use analysis is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). We examine both the quantitative and qualitative aspects of the portion of the copyrighted material taken. *Campbell*, 510 U.S. at 586. Quantitatively, every single photo of the wedding and

almost every photo of the wedding night were published. With respect to the ceremony, none of the three published photos were heavily cropped. The same is true regarding the remaining photos, with the exception of the image where Reynoso is smoking a cigar. Qualitatively, the minimal cropping of each picture demonstrates that the "heart" of each individual copyrighted picture was published. *Elvis Presley Enters.*, 349 F.3d at 630 (courts should "look to see whether 'the heart' of the copyrighted work is taken.").

**[15]** The inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used. But we should be clear, Maya copied 100 percent of the copyrighted photos at issue. *Id.* (noting as to Elvis Presley photos, defendants used "entire picture" in the infringing work). While we do not discredit Maya's legitimate role as a news gatherer, its reporting purpose could have been served through publication of the couple's marriage certificate or other sources rather than copyrighted photos. Even absent official documentation, one clear portrait depicting the newly married couple in wedding garb with the priest would certainly have sufficed to verify the clandestine wedding. Maya used far more than was necessary to corroborate its story—all three wedding images and three post-wedding photos. Thus, analyzing both the quantitative and qualitative aspects of the published material, this factor weighs against fair use.

Maya does not challenge the copyrightability of the individual photos, and each of the five individual images is part of a separate and distinct copyright registration. During oral argument, however, the district court minimized the amount and substantiality of Maya's use in stating: "Defendants published only 5 [sic] of the 400 photographs of plaintiffs' wedding that defendants purchased."[9] While Maya did obtain over

---

[9]The district court made a clearly erroneous finding of fact with respect to this factor. *See Sawyer v. Whitley*, 505 U.S. 333, 372 (1992) (a district court's findings of fact are reviewed for clear error). Although Maya undisputedly published six photos, the district court's finding that five photos, instead of six, were published is an inconsequential error that does not affect our analysis.

four hundred images and three videos from Viqueira's stolen memory chip, only six of the pictures were related to the night of the wedding. Maya, which is in possession of the images, did not produce any of the other images or offer any details as to the remaining content in this assortment. The district court's statement—that "400 photographs of plaintiffs' wedding" were purchased—was in error.

This error was not inconsequential. Benchmarking the use of six images against a vast collection that the court perceived to be other wedding photos tainted the district court's lens on the situation. The facts are to the contrary—a limited number of private photos were taken on Monge's camera on the wedding day and Maya published six of those images. To suggest that this usage should be compared to a universe of four hundred other unidentified images and videos that happened to be located on the storage device makes little sense. It would be akin to taking a random collection of copyrighted materials from someone's trash can and using the stack as the universe of copyrighted work, using a memory stick to copy random photos from various computer files, or randomly downloading hundreds of unrelated copyrighted images from the Internet and thereafter claiming that the infringing use was insubstantial simply because only a few images from this "compilation" were published. Maya's acquisition of a random collection of unidentified, non-wedding related images and videos does not bear on the fair use analysis here, the district court's analysis notwithstanding.

The dissent does not explain why the *only* work at issue is the purported "compilation" or "collection" bought by Maya. More disconcerting is that the dissent's characterization of the four hundred photos as a "compilation" misapprehends the meaning of this term in the copyright law. A "compilation" is defined as "a work formed by the collection and assembling of preexisting materials or of data that are *selected, coordinated, or arranged* in such a way that the resulting work as a whole constitutes an original work of authorship. The term

'compilation' includes collective works." 17 U.S.C. § 101 (emphasis added); *see also id.* (defining a "collective work" as a work "in which a number of contributions, *constituting separate and independent works in themselves,* are assembled into a collective whole." (emphasis added)).

The dissent's effort to recast the images on the storage disk as a "compilation" poses several insurmountable hurdles for Maya. To its credit, Maya made no such argument; this theory is an invention by the dissent. To begin, there is absolutely no evidence that the multiple images were in any way "selected, coordinated, or arranged" to create "an original work of authorship." Maya did not even submit for the record the other material on the storage disk and nothing in the record supports a finding regarding compilation. Indeed, it would take an act of legal clairvoyance to deem the material on the disk a copyrighted compilation without ever seeing it. Finally, Maya bears the burden on this point and yet has offered nothing. To say, as the dissent does, that Maya "carefully selected the photos" (Dissent at 9214) glosses over the reality that Maya copied all of the wedding-related photos. Total appropriation, not selection, would be a more accurate characterization.

**[16]** Each of the individual wedding photos is a separate work[10] because each photo "can live [its] own copyright life" and "has an independent economic value and is, in itself, viable." *Columbia Pictures TV, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1193 (9th Cir. 2001) (affirming prior decision that each episode of television series was a separate "work") (citations omitted). In sum, there is no

---

[10]Although the Copyright Act does not define the term "work," courts approach the definition depending on the specific issue, for example, deciding proper registration, determining whether a work is sufficiently original, and calculating statutory damages. *See generally Nimmer on Copyright* § 2.08. We need not parse the definition in the context of fair use because the outcome does not depend on it. No evidence supports treating the four hundred photos as a single work.

compilation and it makes sense to treat each photo as an individual copyrighted work. Even if the facts could be stretched and the grouping of wedding photos could qualify as a compilation, the result would be the same—Maya's use was not just substantial, it was total. This factor weighs decisively against fair use.

## D. EFFECT UPON THE POTENTIAL MARKET

**[17]** The final fair use factor is "the effect of the use upon the *potential market* for or value of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). The Supreme Court declared in *Harper & Row* that "[t]his last factor is undoubtedly the single most important element of fair use." 471 U.S. at 566 (footnote and citation omitted). Maya argued, and the district court agreed, that no potential market for the pictures existed because the couple did not intend to sell publication rights to the photos. The district court's legal conclusion that the potential market was destroyed due to the couple's then-present intent regarding publication was in error.

As discussed above, in *Campbell*, the Court offered a nuanced approach relating to the presumption of market harm. It explained that commercial use may tip the scale toward market harm, but like the other factors, it "may be addressed only through a 'sensitive balancing of interests.' " *Campbell*, 510 U.S. at 590 n.21 (quotation omitted). Specifically, where "the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Id.* at 591. However, a presumption of market harm "makes common sense[ ] when a commercial use amounts to mere duplication of the entirety of an original." *Id.* Thus, the market harm analysis is affected by whether the harm is caused by commercial use of a mere duplicate or by commercial use post-transformation. *Cf. Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 531 (9th Cir. 2008) ("when 'the intended use is for commercial gain,' the likelihood of market harm 'may be presumed' " (quoting *Sony*, 464 U.S. at 451)).

**[18]** In light of the Supreme Court's admonition eschewing presumptions under this factor, we refrain from presuming harm in the potential market; instead, we determine it in the first instance. The cases addressing the potential market for unpublished works illustrate the importance of letting the copyright owner control first publication. "Under section 107, 'potential market' means either an immediate or a delayed market, and includes harm to derivative works." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990). Control over the delayed market includes future markets. *Id.* Our circuit has gone further to state that "[e]ven an author who had disavowed any intention to publish his work during his lifetime was entitled to protection of his copyright, first, because the relevant consideration was the 'potential market' and, second, because he has the right to change his mind." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000). The Second Circuit is in accord: "It would . . . not serve the ends of the Copyright Act—i.e., to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145-46 (2d Cir. 1998) (internal quotation marks omitted). The potential market for the photos exists independent of the couple's present intent, and the district court's decision to the contrary was error.

**[19]** Recognizing that fair use focuses on *potential*, not just actual, market harm, we note there is little doubt that an actual market exists for the photos. *See Harper & Row*, 471 U.S. at 567 ("The trial court found not merely a potential but an actual effect on the market."). Maya does not offer any evidence of the relevant market or the lack of market harm from its publication other than broad, unsubstantiated statements in its brief. *Campbell*, 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable

evidence about relevant markets." (footnotes omitted)). The magazine's failure of proof is hardly surprising: The couple is undisputedly in the business of selling images of themselves and they have done so in the past and Maya itself paid $1,500 for prior photos. Maya's purchase of the pictures unequivocally demonstrates a market for the couple's copyrighted pictures. And Maya is itself a participant in the market for celebrity wedding photos, as Issue 633 also featured pictures of another celebrity wedding with photos that the magazine purchased. The demand for the pictures in the actual market, just as in the potential market, dropped significantly upon Maya's first and exclusive publication.

The impact on the potential market for unpublished works is best illustrated by the Court's analysis in *Harper & Row*: "The right of first publication implicates a threshold decision by the author *whether and in what form* to release his work." 471 U.S. at 553 (emphasis added). In other words, "[p]ublication of an author's expression before he has authorized its dissemination seriously infringes the author's right to decide when and whether it will be made public, a factor not present in fair use of published works." *Id.* at 551; *id.* at 564 ("right of first publication encompasses . . . the choice whether to publish at all"). As in *Worldwide Church of God*, Monge and Reynoso have "the right to change [their] mind." 227 F.3d at 1119. They reasonably could decide to sell the images for profit in the future, as Reynoso has demonstrably done in the past. Similarly, photos of Monge have also been marketed commercially, even to a Maya publication. While Maya boldly emphasized that its publication was "[f]irst and exclusive," the couple's intention at the time of the publication did not give Maya license to forever deprive them of their right to decide when, "whether and in what form to release" the photos. *Harper & Row*, 471 U.S. at 551, 553. Thus, Maya's claim that a confidential work receives less copyright protection because its author intends to maintain confidentiality finds no support; to the contrary, "[i]t has never been seriously disputed that the fact that the plaintiff's work is

unpublished . . . is a factor tending to negate the defense of fair use." *Id.* at 551 (internal quotation marks omitted).

**[20]** Although the photos were unpublished until Maya printed them for commercial gain, after the publication of Issue 633, the bottom literally dropped out of the market— neither Maya nor anybody else is likely to purchase these pictures from the couple. And it is obvious that any licensing value, to the extent the couple could find a willing licensee, is severely diminished. Maya's un-authorized "first and exclusive" publication of the images substantially harmed the potential market because the publication directly competed with, and completely usurped, the couple's potential market for first publication of the photos.

In addition, "to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Id.* at 568 (quotations omitted). Unrestricted and widespread reproduction of Maya's conduct would not only undermine the ability of celebrities to market images of themselves, but would also create incentives to pirate intellectual property. In this case, "[t]here is no analytical difference between destroying the market for a copyrighted work by producing and selling cheap copies and destroying the subsequent years' market for a [work] by blowing its cover." *Chicago Bd. of Educ.*, 354 F.3d at 627.

Our focus on the usurpation of the market further underscores the limited extent to which Maya transformed the works. In a true transformation, such as the parody in *Campbell*, "it is more likely that the new work will not affect the market for the original . . . because the parody and the original usually serve different market functions." 510 U.S. at 591. Not so here. Maya did not transform the images and create a new work; instead, Maya's mere duplication of the photos "serves as a market replacement for [the originals], making it

likely that cognizable market harm to the original[s] will occur." *Id.* (citations omitted).[11]

The curtailment of both the actual and potential market for the pictures demonstrates that Maya's use, even if credited as mildly transformative, nonetheless functioned as a market replacement for the photos. In this respect, while we do not presume market harm, such a presumption would, as the Supreme Court recognized, make "common sense" here because Maya's commercial use was based on duplication of the original. *Id.* (discussing *Sony*, 464 U.S. at 451).

**[21]** This factor brings us full circle. We recognize that market harm may not be presumed in all instances; however, the harm to both the potential and actual markets based on wholesale copying of unpublished works demonstrates the logic of such a presumption in cases "when a commercial use amounts to mere duplication of the entirety of an original." *Id.* Because the facts demonstrate that Maya's use was akin to mere duplication—affecting both the actual and potential market for the photos—even without the benefit of any presumption, this factor tips against fair use. In this case, the cat is out of the bag.

## III.   DENOUEMENT

Our long journey through the nooks and crannies of fair use law with our colorful cast of characters comes to an end as we determine whether the "most troublesome" doctrine in the law of copyright protects Maya's use. This is neither a mechanistic exercise nor a gestalt undertaking, but a considered legal judgment. Following the statute, we consider each of the four factors and put them in the judicial blender to find the appropriate balance. In doing so, we are not without guidance. Pre-

---

[11]For a discussion of the interplay between transformation of the work and the effect upon the potential market, *see Nimmer on Copyright* § 13.05[4], which explains the tautology inherent in this factor.

cedent from both the Supreme Court and our court gives us a solid foundation to make this judgment. Although we delineate the factors individually, we recognize that our task is to consider these non-exclusive factors as a total package in assessing fair use.

Waving the news reporting flag is not a get out of jail free card in the copyright arena. *Iowa State Univ. Research Found.*, 621 F.2d at 61 ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."). Maya's effort to document its exposé does not automatically trump the couple's rights in its unpublished photos. Because the minimal transformation occasioned by Maya's use is amply outweighed by its commercial use, the first factor does not support the magazine. And, even if it did, this factor does not dwarf the effect of the other factors. Upon balancing the copyright protection for these marginally creative works against their unpublished status, we see nothing exceptional about this case, and follow the Supreme Court's direction that the second factor weighs against Maya in this instance. Next, Maya has not demonstrated that the third factor supports fair use. Maya used virtually the entirety of the wedding-related photographs; much more than was necessary to corroborate its story. Finally, the district court further erred by holding, without support, that the couple's then-present intention destroyed the potential market for the photographic works. Maya's use negatively affected both the potential and actual markets for the couple's photos. Simply because the works were yet unpublished did not give Maya a license to pull the trigger and blow the couple's cover.

**[22]** The balancing of these factors must be weighed against Maya's burden to establish fair use. Without a single factor tipping in its favor, Maya has not met its burden. Because Maya's affirmative defense of fair use fails as a matter of law, the district court erred by granting summary judg-

ment in favor of Maya on the basis of fair use.[12] Instead, the district court should have granted the couple's summary judgment motion on this issue.

**REVERSED and REMANDED.**

---

M. SMITH, Circuit Judge, dissenting:

I respectfully dissent. Copyright is not an inviolable right that confers upon creators absolute control and ownership over their creations. Copyright protection was enacted "[t]o promote the Progress of Science and useful Arts" by creating a system in which authors and artists may reap the benefits of their creative contributions. U.S. Const. art. I, § 8, cl. 8. The fair use doctrine was designed to act as the counterbalance to copyright by "permit[ting] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (internal citation and quotations omitted).

The majority's fair use analysis in this case is inconsistent with Supreme Court precedent, and thwarts the public interests of copyright by allowing newsworthy public figures to control their images in the press. The majority contends that the public interest in a free press cannot trump a celebrity's right to control his image and works in the media—even if that celebrity has publicly controverted the very subject matter of the works at issue. Under the majority's analysis, public figures could invoke copyright protection to prevent the media's disclosure of any embarrassing or incriminating works by claiming that such images were intended only for

---

[12]Because the district court erred in granting summary judgment in favor of Maya, we do not reach the issue of awarding Maya its attorney's fees.

private use. The implications of this analysis undermine the free press and eviscerate the principles upon which copyright was founded. Although newsworthiness alone is insufficient to invoke fair use, public figures should not be able to hide behind the cloak of copyright to prevent the news media from exposing their fallacies. Accordingly, because three of the photos directly proved the fact of the Noelia Monge's and Jorge Reynoso's (the Couple) marriage, I would affirm the district court's finding of fair use as to those wedding photos. However, because the remaining two photos did not directly prove the Couple's wedding and therefore may have been unnecessary to the story, I would remand on the grounds that genuine issues of material fact exist, precluding summary judgment.[1]

## I.   FAIR USE ANALYSIS

The fair use analysis consists of a four-part test, considering:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

---

[1]Registration is a prerequisite to sue under the Copyright Act of 1976. 17 U.S.C. § 411. Accordingly, the Couple may only recover for the five photographs for which they hold registrations. The Couple may not recover for the sixth photograph (taken of the two at a bar) as they do not hold the registration for it (it was taken by a bartender or waitress).

17 U.S.C. § 107.

The majority contends that none of these fair use factors weighs in favor of Maya Magazines's (Maya) fair use of the Couple's wedding photos. I respectfully disagree with the majority's analysis, and I address each of the factors in turn.

## A.   *Purpose and Character of Use*

The transformative use analysis is an integral question under the first factor, and in fair use generally. *Campbell*, 510 U.S. at 579 (explaining that transformative uses "lie at the heart of the fair use doctrine[ ]"); *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[a][1][B] (Matthew Bender rev. ed. 2012). "The central purpose of [the purpose and character inquiry] is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (citations omitted). The use of photographic evidence to prove a "controversial," "salacious," or controverted fact weighs in favor of a finding of fair use. *Murphy v. Millenium Radio Grp. LLC*, 650 F.3d 295, 306 (3d Cir. 2011); *see also Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (finding fair use of nude and semi-nude photographs in controversy over the qualifications of Miss Puerto Rico Universe); *Fitzgerald v. CBS., Inc.*, 491 F. Supp. 2d 177, 186 n. 2 (D. Mass. 2007) (explaining that "recontextualization" of a photo may be transformative when publication is relevant to a newly developed matter of public concern). In the case of photographic works, a use may be found to be transformative if it complements the original work, rather than supersedes it. *Ty, Inc. v. Publ'ns Int'l, Co.*, 292 F.3d 512, 518 (7th Cir. 2002). Ultimately, the more transformative the use, the less other factors, such as commerciality, weigh against a finding of fair use. *Campbell*, 510 U.S. at 579.

The majority contends that Maya's use of the photos was not transformative because (1) the photos were minimally changed with limited commentary; (2) the photos were offered for the exact same purpose—to document the wedding; and (3) the newsworthiness of the photos was insufficient to support a finding of fair use. I respectfully disagree on all three points.

### 1.   Editing, Arrangement, and Commentary

The majority attempts to diminish the significance of Maya's commentary, cropping, re-sizing, and arrangement of the photos by presenting the publication as little more than a photo album. This is simply not accurate. The February 10, 2009 exposé consisted of a stylized two-page spread: on the left page was a full length image of Reynoso and Noelia embracing in the wedding chapel (originally cropped on the front cover), accompanied by a red text box on the lower left hand corner, with the print:

> Definitely, Noelia never ceases to amaze us. Whether it is her fights with her mother, her allegations of sexual abuse, her pornographic videos, her problems with the press or the behavior of her partner, Jorge Reynoso, the Puerto Rican singer always takes over the headlines, and this time is no exception. In fact, a lot has been said about a supposedly secret wedding in Las Vegas, Nevada, that took place in January 2007, but until now, no one had shown photos of that memorable day. *TVNotas* got a hold of those photos and shows them to you now, exclusively.

The second page consisted of a full page, four-photo montage: first, a different wedding picture of Noelia and Reynoso, next to the minister who married them, in the same wedding clothing, in the same chapel, with the caption,"POSING WITH THE MINISTER OF THEIR MARRIAGE," and

accompanying the inset text, "Noelia Lorenzo-Monge and Jorge Reynoso looked happy, she in her stretch mini dress and a garter, he in a suit and tie." To the immediate right of that, a close up photo of Noelia and Reynoso kissing, with two inset captions, above "THEIR FIRST KISS AS MAN AND WIFE" and below, with the accompanying inset text, "After years of a relationship, Reynoso finally came through for her." In the second row, to the left was a photo of Noelia posing next to a seated Reynoso in a bar, his arm around Noelia and a cigar in his hand, with the caption above, "THEY WENT TO A BAR."[2] Finally, to the right of that, a fourth photo of Noelia, laying on the bed in the same stretch white mini dress and black knee high boots, exposing her underwear and looking seductively at the camera, with the above caption, "THIS IS HOW THE SINGER ENDED UP IN THE NUP-TIAL SUITE," also accompanied by a smaller caption inset, "Flirty, suggestive and happy, as every wife would be, the Singer posed ready for her wedding night." At the bottom of the page in bold, large black and white print read: "Though they didn't want to confirm their marriage, these images speak for themselves."

Maya's article constituted much more than a haphazard republication of the Couple's photos. Framed around the Couple's refusals to confirm their marriage and to continue to represent Noelia as an "unwed sex symbol," Maya used the images as documentary evidence. We, as well as our sister circuits, have held that a photo montage, with accompanying commentary, may constitute a transformative use. *See Núñez*, 235 F.3d at 22 (finding transformative use of photographs in news story where "the pictures were shown not just to titillate, but also to inform"), *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) (finding a montage of images of the Los Angeles riots, rather than a mere re-broadcast of the original film, transformative). Maya's com-

---

[2]The Couple did not register this photograph, accordingly, they may not sue for infringement. 17 U.S.C. § 411.

mentary, editing, and arrangement of the photos added to, and ultimately changed, the original character of the images by advancing them as the basis of an exposé. The extent of Maya's editing, commentary, and arrangement thus weighs in favor of a finding of transformativeness. *Campbell*, 510 U.S. at 579.

## 2.  Different Purpose

The majority contends: "[i]n one sense, the parties' purposes are identical: Photographic documentation of the wedding." However, the majority repeatedly confuses the original subject matter of the photos with the intended use of the images. For the Couple, these were personal images, originally taken to capture the night of their marriage. After they were married, however, the photos were kept secret for the Couple's commercial gain. As Reynoso testified, the images were withheld from the public solely for "marketing" purposes, in order to maintain Noelia's "image of being a single singer appeal to young people."[3] ("Q: Why did you decide to have a secret wedding? A: I just mentioned to you that we're trying to protect her image of being a single singer to appeal to young people . . . Q: Were there any other reasons? A: No, just marketing reasons."). For Maya, the photos were used as direct, documentary evidence of a clandestine wedding that had been hidden from the public for years, disproving the Couple's representations to the contrary. Indeed, media speculation regarding their relationship—even referring to them as husband and wife—had occurred years before the publication of the TVNotas expose in February 2009. Thus, the exposé served an entirely different purpose—indeed, a purpose contrary to the Couple's original intent to record and conceal their Las Vegas wedding. *See* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) ("Transformative uses may include criticizing the quoted

---

[3]Reynoso been linked to other publicity stunts regarding Noelia's image as well, including leaking her sex-tape with former-boyfriend.

work, *exposing the character of the original author*, *proving a fact*, or summarizing an idea argued in order to defend *or rebut it.*") (emphasis added). Accordingly, I would find that the fundamentally different purpose of Maya's use also weighs in favor of a finding of transformativeness.

### 3.   Newsworthiness

The majority misguidedly relies on *Harper & Row* to criticize newsworthiness as a basis for fair use. However, *Harper & Row* is distinguishable on two critical points: (1) the excerpts at issue were soon-to-be published in a hard-cover memoir by their author, President Gerald Ford, and rights to publish excerpts had already been bid on, and sold to, competing magazines; and (2) Ford had never concealed or controverted the facts at issue in the infringing excerpts. 471 U.S. at 563-64.

Specifically, *Harper & Row* involved the surreptitious publication by a magazine, *The Nation*, of critical excerpts of Gerald Ford's soon-to-be published memoirs regarding the Nixon pardon ("A Time to Heal"). *The Nation* published the excerpts for commercial gain in an effort to "scoop" the hard-cover release, as well as its competitors, who had rightfully bid for publication rights. *Harper & Row*, 471 U.S. at 563-64. Here, there was no such subterfuge. The Couple had concealed the truth of their relationship from the public, and even from their close friends and family. The photographs proved not only their marriage, but when, where, and how it took place, and for how long the Couple had hidden the truth. In short, Maya's exposé constituted a transformative use because it "shed[ ] light" upon the Couple's covert nuptials. *See Campbell*, 510 U.S. at 579.

The majority contends that if a work is created for "private use," and then subsequently published without permission because it is newsworthy, that the publication cannot constitute a fair use. The logical extension of the majority's reason-

ing could produce absurd results. If public, newsworthy figures were permitted to invoke a "private use" exception, Tiger Woods, for example, could have claimed copyright in his sexting messages and, without fair use, the media would have no right to quote them.[4] Likewise, without a fair use defense, the media would have only been able to describe former Congressman Anthony Weiner's self-portraits, rather than reprint the images themselves. Thus, the majority attempts to distinguish Maya's use of the wedding photos from "legitimate" fair uses—namely, when the "content of the photographs is the story." In so doing, the majority oversimplifies Maya's use of the images and superimposes the court as the final arbiter of what is sufficiently "salacious" or "controversial" to constitute a "legitimately" fair use. This is a "dangerous" intrusion upon both the sanctity of the free press and copyright. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.").

The majority's proposed test would effectively vest in the courts the power to circumscribe news stories and the sources upon which the media may rely. The line between when a

---

[4] The majority implies that Woods' sext messages and former Congressman Weiner's tweets and Facebook messages were public because they "distributed their 'masterpieces' to others." The majority's contention is contrary to well-established copyright law. The Copyright Act defines "Publication" as "the *distribution* of copies or phonorecords of a work to the *public* by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101 (emphasis added). Merely sending suggestive self-portraits or "sexts" to another, private person does not launch a work into the public domain. *See, e.g.*, *Salinger v. Random House, Inc.*, 811 F.2d 90, 96 (2d Cir. 1987) (emphasizing the private and unpublished nature of J.D Salinger's personal letters). Woods's "writings" were likely always intended to be kept secret between author and inspiration. And, but for one rogue tweet, former Congressman Weiner's "works" were kept privately between him and his desired recipients.

copyrighted work "is the story" and when it is not is not nearly as clear as the majority contends. Thus, if the "story" of Tiger Woods' infidelities was limited to merely exposing his multiple mistresses, the majority's test would still prohibit the "fair use" of his sexts because his liaisons could be proven by other, non-copyrighted sources. Likewise, it is unclear whether republication of former Congressman Weiner's semi-nude tweets and graphic Facebook messages would be deemed entirely necessary to investigate the organized "cover-up" of his online trysts. News stories have multiple purposes, layers, and facets and, by their nature, evolve over time. Here, while the TVNotas article began as a factual exposé, the story did not end there. Noelia and Reynoso were celebrities who carefully concealed their relationship to maintain Noelia's image as a single sex symbol. Maya's use of the photos was thus integral to exposing to the public the depth of their relationship and the actual events of their secret Vegas wedding night—the venue, the clothing, the after-party. Contrary to the majority's contentions, a mere marriage certificate would not suffice.

Accordingly, I would reject the majority's approach and hold that the fundamentally different purpose underlying Maya's publication of the photos constituted a transformative use, and thus counterbalanced the commerciality of the use such that the first favor weighs in favor of a finding of fair use.

B.   *Nature of Copyrighted Works*

In determining the nature of the original work, we decide "*first,* the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination, . . . and *second*, whether it is unpublished, in which case the right of first publication is implicated." *Núñez*, 235 F.3d at 23 (citing *Harper & Row*, 471 U.S. at 563-64) (emphases added). Because "[t]he law generally recognizes a greater need to disseminate factual

works," the "nature of the work" inquiry is designed to distinguish between the levels of "core" protectability of copyright. *Harper & Row*, 471 U.S. at 563, 584 n.7 (Brennan, J., dissenting). Indeed, we have held that where a copyrighted work is "informational and factual and news; each characteristic strongly favors [a finding of fair use]." *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 939-40 (9th Cir.), *as amended*, 313 F.3d 1093 (9th Cir. 2002). The tiered approach thus reflects the understanding that certain types of works—namely, fictional, creative, and unpublished works—fall closer to the core of copyright, and other types of works—namely, factual, informative, and published works—enjoy generally less protection. *Id.*

The majority reasons that the nature of the original photographs weighs against a finding of fair use because they were unpublished. The majority's analysis is flawed on two grounds: (1) the majority ignores the threshold determination that the photos were factual and documentary in nature; and (2) even if the unpublished nature of the work did cut against a finding of fair use, the majority fails to address the fact that the "nature of the work" analysis is much less significant in cases of transformative use.

The majority concedes that the photographs were essentially factual in nature, noting that the images were taken as "[p]hotographic documentation of the wedding" and characterizing the photos as "point-and-shoot," and thus "not highly artistic in nature." Thus, as a threshold matter, the factual and informative nature of the photographs places them outside the core of copyright protection. *See Campbell*, 510 U.S. at 563; *see also Kelly v. Arriba Software*, 336 F.3d 811, 820 (9th Cir. 2003). While the photos were admittedly unpublished, this factor is less significant because the photographs were documentary in nature. *See Narell v. Freeman*, 872 F.2d 907, 914 (9th Cir. 1989) ("The scope of permissible fair use is greater with an informational work than a creative work."); *see also Stewart v. Abend*, 495 U.S. 207, 237-38 (1990). Moreover,

even if the unpublished nature of the photos did undercut their factual character, any possible impact is further mitigated by the fact that Maya's exposé constituted a transformative use. Although the majority attempts to use the unpublished nature of the works to trump their factual character and Maya's transformative use, we have held in cases of transformative use, the nature of the work carries *less* significance. *See Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (explaining that when dealing with transformative uses, the second factor is much less significant in the overall fair use analysis). Accordingly, I would hold that the second factor weighs either neutrally or slightly in favor of a finding of fair use.

## C.  *Substantiality of Use*

When excerpts of a work or compilation of works are taken to tell a narrative different from, and independent of, the collection in its entirety, we may consider the selection and proportion of the excerpts used against the collection as a whole. *See generally Ty,* 292 F.3d at 522-23 (explaining that use of copyright works that exist within a greater collection, *e.g.*, the full collection of Beanie Babies used in a comprehensive guide or the use of particular quotes in a book review, may constitute fair use if used to serve an acceptable purpose). Although taking the "heart" of a work generally weighs against a finding of fair use, selectivity in using only what is necessary cuts both ways and must be considered in evaluating the amount and substantiality of the use. *See L.A. News Serv.*, 305 F.3d at 941.

The majority concludes that because Maya minimally cropped and altered the five wedding photographs that, qualitatively and quantitatively, the substantiality of the use weighs against a finding of fair use. Without citation to any legal authority, the majority reasons that the district court committed clear error by reasoning that the amount and substantiality of the use supported a finding of fair use because the Maya

only used five of approximately four hundred photos and three videos available to it on the memory disk. The majority's analysis lacks any basis in law or fact.

Contents unseen, Maya purchased a memory disk of four hundred photos and three videos of Noelia and Reynoso. Maya paid for that disk, in its entirety, as a compilation. Indeed, the paparazzo, Oscar Viquiera, received $1,500 for the disk, as a whole. From that disk, Maya culled through, extracted, and ultimately published five photos from the Couple's secret wedding night to use in its photo montage exposé. Out of all of the possible photos that Maya could have selected from the disk, Maya chose those five because they told the story of the Couple's clandestine nuptials in Las Vegas.

The majority fails to address, let alone refute, the impact of Maya's selectivity because it contends that Maya's use of the photographs must be evaluated individually since each photograph was copyrighted and registered individually. However, the majority fails to cite a single case for the proposition that, because images within a copyrightable compilation were individually registered, the amount and substantiality of the use must be evaluated on an individual basis. To the contrary, Nimmer observes, "The third factor listed in Section 107 is 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole.' *The 'copyrighted work' has been held not necessarily to correspond to the registered work.*" 4 Nimmer on Copyright § 13.05 [A][3] (footnotes omitted) (emphasis added).

As a matter of law, the district court could not have committed clear error because there is no binding legal authority contrary to the district court's holding.[5] The record proves that

---

[5]Indeed, the only legal authority the Majority cites even related to this proposition is *Sawyer v. Whitley*, 505 U.S. 333 (1994), a Supreme Court case articulating the clear error standard in a habeas petition.

the memory disk was the private property of Reynoso and Noelia, and that the images and the videos on the disk were related, personal images and videos of Reynoso and Noelia. Indeed, Juan Guadalupe Garcia Alejandro, Editor of TVNotas, testified that the four hundred photos and three videos on the disc were images of the Couple. The majority's contention that the images were "unrelated" likewise contradicts record. The fact that the photos and videos on the disk consisted of the same subjects (Reynoso and Noelia) and, presumably, the same authors (Reynoso and Noelia) supports assessing the amount and substantiality of Maya's use in light of the *collection* of the four hundred images and three videos on the disk. *See generally Walt Disney & Co. v. Powell*, 897 F.2d 565, 570 (D.C. Cir. 1990) (treating individual photographs of same subject as compilation, even though individually registrable). The majority's attempt to characterize Maya's use of the six wedding photos as a "total appropriation" is simply inaccurate; the photographs were taken of the same subjects, fixed on the same medium, and paid for as part of a collective whole. Thus, the majority lacks any basis in either law or in fact to hold that each photograph *must* be evaluated individually.[6]

The reality is that Maya carefully selected the photos out of four hundred possible photos and videos on the disk because

---

[6]The majority devotes a substantial portion of its analysis to characterizing the "amount and substantiality" of Maya's use as a "total appropriation." The majority fails to address, however, the limited impact of this factor, as a whole, when a use has been deemed to be "transformative." *See Campbell*, 510 U.S. at 579. Both the district court and this dissent characterized the third factor as "neutral," acknowledging facts that weighed both in favor of and against the fairness of the substantiality of Maya's use. The more critical issue, here, is that the transformative purpose of Maya's use, and the reasonableness of Maya's use in light of its purpose, significantly limits the impact of the third factor on the overall fair use analysis. *Castle Rock Entm't, Inc. v. Carol Publ'g*, 150 F.3d 132, 144 (2d Cir. 1998) (emphasizing the importance of determining whether copying is "consistent with or more than necessary to further 'the purpose and character of the use' " (quoting *Campbell*, 510 U.S. at 586-87)).

it wanted to use them to tell the wedding story. Three of those five photos depicted the wedding itself. The law dictates, at least as to the three photos that depicted the wedding ceremony, that Maya's relative restraint in choosing only those photos supports a finding of fair use. *See generally Ty,* 292 F.3d at 522-23 (selectivity of images required to accomplish an acceptable purpose, even images used in their entirety, mitigates the substantiality of the use); *cf. Los Angeles News Serv.,* 305 F.3d at 941. Admittedly, Maya's use of the additional two other photos, of the Couple at the bar, and of Noelia on the nuptial bed, was not necessary to prove the story of their secret wedding. Maya's use of these photos is thus qualitatively distinct from the three images directly depicting the wedding.[7] Accordingly, I would hold that, at least as to the three photos of the wedding ceremony, Maya's selectivity and restraint from using more from the four hundred possible images and videos weighs either neutrally or slightly in favor of a finding of fair use.

D. *Harm to Potential and Future Markets*

The majority contends that the Couple's intention never to release the photographs, let alone sell them, does not affect our analysis of harm to potential and future markets. The majority relies on *Worldwide Chuch of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) for the proposition that even if an author completely "disavowed any intention to publish his work during his lifetime" that unauthorized publication of the work by another could still harm

---

[7]Here, I believe the interplay between the selectivity of the use and the appropriateness of summary judgment is critical. Summary judgment on fair use grounds is appropriate only if it is the only reasonable conclusion a trier of fact could reach in the case. *See KCAL-TV Channel 9*, 108 F.3d at 1123. Because two of the five photographs did not directly depict the wedding (one pictured the Couple at a bar in Las Vegas and the other featured Noelia, exposing her underwear on a hotel bed), I believe a genuine issue of material fact may exist as to the necessity of their publication in the wedding exposé.

potential and future markets. *Id.* at 1110, 1119. But the majority's selective analysis mischaracterizes our holding in *Worldwide Church of God*. *Id.* at 1119. In *Worldwide Church of God*, we specifically exempted from the aforementioned reasoning publications involving "market failure," in which an author specifically keeps a work from being published for the purposes of concealing information:

> When an owner refuses to license because he is concerned that defendant's work will substitute for his own work or derivative works, the owner is representing not only his own interest, but also the interest of his potential customers and thus the public interest. Market failure should be found only when the defendant can prove that the copyright owner would refuse to license out of a desire unrelated to the goals of copyright-notably a desire to keep certain information from the public.

*Id.* at 1119 n. 2 (quoting Wendy Gordon, *Fair Use As Market Failure: A Structural and Economic Analysis of the Betamax Case and its Predecessors*, 82 Colum. L. Rev. 1600, 1634 (1982)).

Here, the Couple's intention never to publish photos *must* frame our market harm analysis because their intention was based upon their desire to conceal their secret Las Vegas wedding from the public. The fact that on the date of publication, nearly two years after their wedding, they had still refused to even tell their families, let alone the general public, proves this to be true. The application of the market failure exception makes sense here because the Couple sought to conceal their wedding out of their own interests, namely, to preserve Noelia's image as a "sex symbol," in spite of the common public interest in informing their fans and followers of the event. *See Worldwide Church of God*, 227 F.3d at 1119 n.2 and accompanying text; *see also Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (find-

ing Diebold's subjective intent to conceal problems with its online voting software dispositive in its analysis of potential market harms). Accordingly, in light of the Couple's intention to continue to conceal their Las Vegas nuptials, I would hold that the market failure harm exception to the harm to potential and future markets militates toward a finding of fair use.

## CONCLUSION

"Overprotecting intellectual property is as harmful as underprotecting it. Creativity is impossible without a rich public domain." *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1513 (9th Cir. 1993) (Kozinski, J., dissenting from order denying rehearing en banc). To satisfy a celebrity couple's desire to control their public images, the majority extends inapposite case law to undercut the fair use doctrine and the free press. Rather than follow the majority's course, I would affirm the district court's grant of summary judgement on fair use grounds, at least as to the three images of the wedding in the exposé, and remand due to disputed issues of material fact regarding the use of the remaining two non-wedding photos.